TOWNSHIP OF MIDDLETOWN, A MUNICIPAL CORPORA-
TION OF THE STATE OF NEW JERSEY, APPELLANT,
v. DANIEL S. MURDOCH AND THE CIVIL SERVICE
COMMISSION OF THE STATE OF NEW JERSEY, RE-
SPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued December 11, 1961—Decided April 16, 1962.

512

513

Before Judges GOLDMANN, FOLEY and BARRETT.

*Mr. Henry J. Saling* argued the cause for appellant (*Messrs. Roberts, Pillsbury & Carton,* attorneys; *Mr. Lawrence A. Carton, Jr.,* of counsel and on the brief).

*Mr. Edward W. Wise, Jr.,* argued the cause for respondent, Daniel S. Murdoch (*Messrs. Wise, Wise, Wichmann & Berich,* attorneys).

*Mr. William L. Boyan,* Deputy Attorney General, filed a brief on behalf of respondent, Civil Service Commission (*Mr. David D. Furman,* Attorney General, attorney).

The opinion of the court was delivered by

FOLEY, J. A. D. The Township of Middletown appeals from a judgment of the Civil Service Commission (Commission), directing the reinstatement of defendant Murdoch who previously had been removed from his position of patrolman by the Township Committee, after a hearing of departmental charges.

Murdoch was charged with "misconduct subversive of good order and the discipline of the police force and conduct unbecoming an officer," in the respects that:

(a) on April 5, 1960, at or about 2:30 A. M. while on duty, he removed from the private property of Middletown Garden Center, Middletown, New Jersey, without the consent of the owners of that establishment, articles of merchandise consisting of a mailbox, a wooden sign, ornamental dog, two pair of pruning shears, glass spray jar, letters for the sign, and a small crow bar;

(b) on April 5, 1960 "in the morning" he admitted to Police Sergeant Elwood Seeley in the course of an investigation of his activities, that he had "taken" the articles;

(c) at about noon of the same day he admitted to both Police Captain William Woodward and Lt. Joseph McCarthy that he had taken a mailbox, a wooden sign and letters for the sign from the Middletown Garden Center;

\*        \*        \*        \*        \*        \*        \*

(e) he failed to divulge to the police department on April 5, 1960, and thereafter, all information, evidence and other relevant data pertaining to the investigation of the Middletown Garden Center at or about 2:30 A. M. on that date.

He was charged also, in paragraph (d), with "insubordination, neglect of duty and willful disobedience of rules and regulations," in that on April 5, 1960 he refused to comply with an order of his superior, Captain Woodward, to render a written report of his activities relating to such investigation. All the foregoing was charged as contrary to *N. J. S. A.* 11:22–38 of the Civil Service Commission, rules promulgated pursuant thereto, and *N. J. S. A.* 40:47–6, as well as the provisions of the local police ordinance.

After a full hearing, at which defendant appeared and presented his defense, the Township Committee dismissed

charge (a). However, it found that charges (b), (c), (d) and (e) had been sustained and, consequently, ordered respondent's removal from his position as patrolman.

On appeal the Commission "dismissed" charges (d) and (e) and found the respondent "not guilty" of charges (b) and (c).

Appellant does not challenge the action taken on charges (d) and (e) which, we may say without further comment, we believe to have been justified. The issue now raised is whether the action of the Commission with respect to charges (b) and (c) was arbitrary, capricious and unreasonable.

Initially, the scope of our review should be defined. On an appeal from the determination of an administrative agency it is not within our competency to balance the persuasiveness of evidence on one side, as against the other. The choice of accepting or rejecting the testimony of witnesses rests with the administrative agency. Insofar as the evidence is concerned, we are limited to a determination of whether or not there was substantial evidence to support the conclusions reached. *Hornauer v. Div. of Alcoholic Beverage Control,* 40 *N. J. Super.* 501, 506 (*App. Div.* 1956). See also *United Hunters Ass'n of New Jersey, Inc. v. Adams,* 36 *N. J.* 288 (1962). The "substantial evidence" however, must be legal evidence; the factual conclusions drawn therefrom such as might be said by reasonable men to flow naturally from the evidence; and the legal conclusions based thereon, in accord with established legal principles. Present these factors we are without authority to disturb the administrative holding, although had we been given free rein to weigh the evidence we might have decided the case differently. If, however, any of these factors be absent, the challenged determination may be regarded as arbitrary, capricious or unreasonable.

The charges arose from an episode which occurred on April 5, 1960. At about 2:35 A. M. on that day Sergeant Seeley, on desk duty at the police headquarters, received

a radio call from patrol car # 31, which was operated by patrolman Dominic Furiato, reporting an open door at the Middletown Garden Center. Seeley, by radio, dispatched patrol car # 32, operated by patrolman John B. Kelly, to the scene, for the purpose of "checking out" the building. Murdoch, on duty as a plain-clothesman attached to the detective division, heard Furiato's call and being a short distance away, drove his patrol car to the Garden Center. Murdoch and Furiato proceeded to check the building and when Kelly joined them shortly thereafter, he assisted in this duty. This done, Furiato resumed his patrol, while Murdoch and Kelly returned to the police headquarters in time for Kelly to replace Sergeant Seeley at the desk and relay the 3:00 A. M. time signal. Murdoch's tour of duty for the day ended at that time.

What happened thereafter is a matter of considerable dispute. Shortly after Kelly took over the desk, Seeley left the headquarters to go on patrol. He said that on the way to his patrol car he looked in Kelly's and Murdoch's private automobiles with a flashlight; that he observed in the rear of Murdoch's car a bag marked "Middletown Garden Center"; protruding from it was a wooden sign with jagged edges, such as is used on the lawn of a residence to identify the occupant; some handles were "sticking up," and some hose and "stuff" lay in the car; but "the main thing was this bag full of stuff in the rear of the car."

Continuing, he said that he then "checked" by radio with Kelly who was at the desk, and asked him whether Murdoch had been over to the Garden Center; Kelly said that he had; that this was the first knowledge he had that Murdoch had been there; he then called Furiato in car # 31 and instructed him to come to the police station; when Furiato arrived he had a conversation with him and Murdoch who was about to leave for home, and reprimanded both for spending too much time in "checking out" the Garden Center. (Evidently Seeley did not at that time mention

to either of the men what he had seen in the rear of Murdoch's car.)

Seeley testified further, that shortly thereafter he drove to Murdoch's home, Murdoch drew up and joined him in the police car. Seeley said:

"I again stated to him that there was something wrong over there, that too much time elapsed in checking it out and that I wanted to know what happened. He stated again that they were talking over there and nothing happened. We played cat and mouse a little bit you might say, and finally I came out and told him I knew he had the stuff in the car and I wanted to know what was the story on it."

According to Seeley, Murdoch then said that he had taken the articles, and he left to talk with his wife; when Murdoch returned they went to his car, took the bag from it and Murdoch placed the bag and its contents in the rear of the patrol car; he examined the contents and found the sign, mailbox, pruning shears, a larger pair of shears, letters and an iron dog; all these articles were new, and the mailbox was enclosed in a cellophane wrapper; they then went inside the Murdoch residence and he and the Murdochs conversed at length, and that:

"His wife was upset about it. She wanted to know why he did it. He said it was a foolish thing and he shouldn't have done it and he would take the articles back. It was a long conversation involving what it would mean to him, his family, to the police department, my position in the matter."

Seeley said that he told Murdoch he would "have no part" in returning the goods, and suggested that they call Captain Woodward "and tell him the whole story"; they attempted to reach this officer on the telephone but were unsuccessful. The witness said that he was in the Murdoch house "a good two hours"; among other things Murdoch said that "if this thing came out he would have to resign, sell his house, move out of town." Murdoch and his wife "were both concerned about the effect this would have on the children. I might add so was I"; eventually Seeley

and Murdoch went to a nearby diner; when they returned Murdoch carried the "stuff" from the patrol car and put it in the vestibule of his house; after further conversation in which Murdoch reiterated his desire to return the articles, Seeley left "with the understanding that that was going to be the end of it right there" and "if nothing did come up on it he [Murdoch] would be working the following night * * * and would drop the stuff off there at the Garden Center."

It was then about 6:00 A. M. Seeley was relieved from duty at 8:00 A. M. and went home. He testified that after a conversation with his wife he returned shortly after 9:00 A. M. and reported the incident to Captain Woodward.

Murdoch's version of the conversations at the police headquarters was not essentially different from that related by Seeley except, he said, that before Furiato arrived Seeley intimated that Furiato had "taken something" from the Garden Center.

However, his account of what transpired at his residence differed markedly from that of Seeley. He testified that shortly after he reached home Seeley drew up in a police car. He got out of his car and asked Seeley what he wanted. Seeley said he wanted to know "what the hell you guys are doing at the Garden Center," and "I think something else happened besides being in there too long. I think you guys took something." Murdoch replied, "What makes you think that?" Seeley said, "I saw them tools in your car." Then:

"By this time we went over to his patrol car and were talking about it. I said, 'You are crazy. We didn't take anything. That is impossible. You can ask them other two guys. I certainly am going to vouch for them. They didn't take anything.'

He said, 'I am going to face you up with it. I seen it in the back of your car.' 'What?' 'Some garden tools, a garden hose and some tools on the front seat and some in the back.' "

Murdoch said that he then explained that the "stuff" belonged to his father and his father-in-law, and the garden

hose had been there for "a week and a half," and had been used to pump water out of the cellar in "the house he was building." He went on to say that his wife then came out and "wanted to know what the trouble was," and he invited Seeley into the house and they discussed it for "about an hour and a half." Asked what they talked about, he testified:

"It rambled back and forth between the friction between Sergeant Seeley and Officer Furiato. They had been filing reports against one another back and forth and that if he let anything go by the boards and Furiato was involved in it, he would be crazy because Furiato would turn him in. He couldn't afford to let anything go by. He was a Sergeant. He got $240 a year for it, that was his job, and that was what he was going to do. He made up his mind that he was going to get them guys if it took him twenty years on the force. That was his statement to my wife and me."

Murdoch denied that either he or Seeley had taken anything from his car and placed it in the patrol car. He agreed that Seeley had suggested that they call Captain Woodward and that they were unsuccessful in reaching him. He said also, as did Seeley, that they then went to a diner. However, he testified that when they returned Seeley came in the house and said to his wife, "Well, I guess the stuff in the car does belong to your father-in-law, the tools and stuff like that, but I am going to have to turn a report in to Captain Woodward in the morning about how long you fellows were in the Garden Center and let him take it from there." Mrs. Murdoch corroborated her husband's story of what happened in her presence.

Captain Woodward testified that Seeley had reported the matter to him shortly after 9:00 A. M. and that he relayed the report to Chief of Police Hoyer and Captain Walling, then assisted by Lt. Joseph McCarthy commenced an investigation.

About noon they called upon Murdoch, his wife being present. According to Woodward the following took place:

"Officer Murdoch asked what we wanted, a few words to that effect, what we were there for. I stated something like, 'The cat's out of the bag, Dan. I was talking to Sergeant Seeley and I want to know just what went on at the Middletown Garden Center.'

He didn't make a statement right off until after he seemed to know that I knew what had gone on. It was then that—"

Again:

"I stated, 'The cat's out of the bag.' I confronted him with what was told me by Sergeant Seeley. I requested that he go to police headquarters and make a statement on the whole thing to Chief Hoyer. He, in turn, stated that before he would make any statement to the Township Committee, or any report on it he would resign. On at least three occasions he reached in his pocket presumably to reach for his badge, and stated, 'I will turn in my badge and resign.'

He stated that he had taken a sign, a mailbox and some letters. I questioned him as to why. He stated that he was building a new home and just thought he could use them. But that if that was brought out, then he would take and resign from the Police Department and sell his home that he was building and move out of the Township."

On cross-examination, Captain Woodward testified:

"Q. You say you went in the house and you then confronted Patrolman Murdoch with what Seeley had told you? A. Yes, sir. Part. I didn't go into the whole detail of it.

Q. But you told him that Seeley had told you that Murdoch had taken something from the Garden Center? A. I stated that he had been accused of it, yes, sir.

Q. By Sergeant Seeley? A. That's right.

Q. That is the only accusation made? A. That's right.

Q. Then Officer Murdoch called his wife in the room, did he not? A. At some stage of the conversation, yes, sir.

Q. At this point everybody was more or less talking at once? There was a bit of confusion, wasn't there? A. I wouldn't say we were talking at the same time. We took turns talking, but we were just like us having a conversation around this table. We all had part in the conversation.

Q. You mean it was as well organized as the conversation we are having here? A. No, sir. There was quite a bit of tension. I believe I even stated in conversation it was a rotten job but we had to do it, something to that effect. I wanted to know what had happened and taken place."

Woodward also testified that Murdoch told him that he had returned the mailbox, sign and letters, after Sergeant Seeley had left.

Lt. McCarthy described the conversation between Murdoch and Captain Woodward as follows:

"Q. Will you tell us what the conversation was that occurred and relate the conversation to the person making the statement? A. Captain Woodward said in effect that—

Mr. Wise: No, what he said.

The Witness: He said, 'The cat's out of the bag and Sergeant Seeley reported to me that items were taken from the shopping center. We are down here to see what you have to say about it.'

By Mr. Saling:

Q. What did Danny Murdoch say about it? A. He stated he took a mailbox and a sign."

Lt. McCarthy also testified that when Captain Woodward asked Murdoch to accompany them to the police headquarters and give a voluntary statement, Murdoch "said that he didn't want to make a statement and he said he would resign his job or turn his badge in." He thought that Murdoch also said, "Do you want my badge?" at the time, and that he had replied, "No, Danny, it wouldn't be up to me."

Murdoch's version of the conversation was:

"Q. What was that conversation? A. I let them in the door and offered them a seat and asked them what they wanted. Captain Woodward stated to me that Sergeant Seeley had filed a report against myself for an alleged theft at the Garden Center implicating Sergeant Kelly.

I said that was preposterous, in so many words. I asked him, I asked, 'What are you down here for, my badge, or do you want me to resign?' Somebody was out to get me I figured. They said, 'No,' he and Lieutenant McCarthy. It got pretty hectic for three or four minutes about who stole which and my denials. Lieutenant McCarthy settled on one question, what did I do with the stuff. I told him, I said, 'Joe, if I had taken anything like that, my wife would have made me take it right back to the place because she doesn't want anything to do with that.' That is it.

I certainly didn't mean to confuse the issue at the time, but I must have. I know I never at any time admitted to those officers

that I took anything from the Garden Center or had anything in my house that would come from the Garden Center."

Mrs. Murdoch again corroborated the testimony of her husband.

The foregoing comprises the essential evidence bearing on charge (b), the admission of guilt to Sergeant Seeley, and on charge (c), the admission of guilt to Captain Woodward and Lt. McCarthy. Obviously, definitive adjudication of these charges required that in each case a determination be made by the hearer of the credibility of the persons involved.

The "Findings of Fact" as they relate to charges (b) and (c) were set forth by the hearers as follows:

"The appellant is found 'not guilty' of charges (b) and (c) because it is perfectly clear in the minds of the Hearing Commissioners that Murdoch did not pilfer any article or articles from the Middletown Garden Center and from careful consideration of all of the testimony adduced it is the unanimous conclusion of the Commissioners that Patrolman Murdoch had experienced a reputation as a 'good' patrolman until the date of the alleged incident, and deserves complete vindication of any stigma attached to his good name while employed as a member of said Department."

The "conclusion" as it may inferentially relate to these charges was stated to be:

"The Township Committee of Middletown exercised poor judgment in dismissing Patrolman Murdoch from his position after finding him 'not guilty' of the serious charge, charge (a), the alleged theft of the articles * * *."

Appellant's basic challenge to the order of the Commission is that critical analysis of the finding discloses that the Commission exonerated Murdoch on charges (b) and (c) only because the Township, after hearing, had dismissed charge (a). Appellant urges that charges (b) and (c) constituted offenses separate and distinct from charge (a) and that the failure to consider and adjudicate them as such, was an arbitrary, capricious and unreasonable act.

No express finding was undertaken by the hearers on the issue of credibility as between Seeley and Murdoch and his wife, although it may be inferred that the self-described actions of Seeley, including his own violation of a police regulation which required him to impound allegedly stolen goods, and his alleged animosity toward Furiato deeply affected the weight accorded his testimony by the hearers. However, in the testimony of Captain Woodward and Lt. McCarthy, described as "neutral" witnesses by the hearers, there is no suggestion that either was doing anything more than to perform his assigned duties, and there is no indication whatever that either officer bore ill will toward Murdoch, or was motivated to hurt him in any way. Indeed, it appears that Captain Woodward expressed regret that he was burdened with this task. It is difficult to conceive of a reason for disbelieving these men, and the hearers assigned none. The Civil Service Commission spoke in its decision of the situation during the conversation at the Murdoch house as being one of "utter confusion." Captain Woodward specifically denied that there was any confusion when he talked to Murdoch: "We took turns talking, but we were just like us having a conversation around this table. We all had part in the conversation." But, assuming that the broad discretion granted the fact finders encompassed a right to disbelieve these witnesses, the obligation devolved upon the hearers to state they had done so, and their reasons for so doing. Only in this way can a reviewing court determine whether or not discretion was arbitrarily exceeded. The right to *disbelieve* testimony does not include a right to *disregard* it, where, as here, it is untainted by patent or inherent infirmity. *Cf. In re Perrone*, 5 *N. J.* 514 (1950).

We are convinced that the single reasonable interpretation of the Commission's findings and conclusions, is that the hearers accepted as *res judicata* of charges (b) and (c), the dismissal of charge (a) that Murdoch had committed

a theft, and on that basis concluded that he could not be found guilty of charges (b) and (c).

While, as previously noted, the hearers found Murdoch not guilty because it was "perfectly clear in [their] minds that Murdoch did not pilfer any article or articles from the Middletown Garden Center," it is also apparent that this determination emanated from the hearers' understanding of the legal effect of a dismissal of charge (a) by the Township Committee—a dismissal referred to and repeatedly emphasized in the Commission's discussion of the case. That this was their state of mind is demonstrated not only by their "conclusion" that the "Township Committee of Middletown exercised poor judgment in dismissing Patrolman Murdoch from his position after finding him 'not guilty' of the serious charge (a), the alleged theft of articles," but also by a preceding portion of the discussion which was made part of their findings by reference, in which they said:

"The Hearing Commissioners firmly believe that the American way of life would be served no good by finding a man 'not guilty' of stealing something and in practically the same breath state that he be found 'guilty' of having confessed to the same."

We need not pause here to discuss the question of whether Murdoch could have been found guilty of charges (b) and (c) had he also been found guilty on proof offered in the same proceeding, municipal or civil service, on charge (a). *Cf. In re Cohen,* 56 *N. J. Super.* 502, 508 (*App. Div.* 1959), certif. denied 31 *N. J.* 297 (1960). Assuming, but not deciding, that had the proceeding been so cast, the misconduct charged in (b) and (c) would have merged in (a) if Murdoch were found guilty of that charge, it does not follow that an acquittal on charge (a) was so inconsistent with guilt of charges (b) and (c) as to render the findings on those charges nugatory.

While all three offenses constitute misconduct, in the sense that they are generally violative of the police regula-

tions of Middletown, the quality of the offense charged in (a) is vastly different from that charged in (b) and (c). Charge (a) sounds in the indictable offense of larceny, *N. J. S.* 2*A*:119–2, while charges (b) and (c) charge no crime. *Cf.* the consolidated cases of *Atkinson v. Parsekian,* and *State of New Jersey, Div. of Motor Vehicles, et al., v. Ralph,* 37 *N. J.* 143 (decided April 2, 1962), in which the Supreme Court in a different factual setting, quoting from *Commonwealth v. Funk,* 323 *Pa.* 390, 186 *A.* 65 (*Sup. Ct.* 1936), pointed out that a judgment rendered in a criminal proceeding has no probative value in a subsequent administrative proceeding beyond the mere fact of its rendition. See also *State v. Cohen,* 32 *N. J.* 1, 8 (1960).

It is our view that the Township Committee acting in a *quasi*-judicial capacity might well have thought that conviction of charge (a) necessitated proof of all of the elements of the crime of larceny, and have decided that the evidence fell short of meeting this standard. For example, the Committee may have found that Murdoch returned the goods to the Garden Center, based upon his own statement of his intentions as testified by Seeley, the testimony of Woodward and the hearsay testimony that "nothing was missing" from the Center, a subject on which we will shortly comment, and thereby have erroneously concluded that such restitution expiated his guilt; or, (again erroneously) that the production of the stolen articles at the hearing was requisite to proof of the *corpus delicti*. If the Committee did reason thus, it could well have decided, albeit in error, that charge (a) was not *proven* and that it thereby became the duty of the Committee to acquit, whatever may have been the thoughts of its individual members on the subject.

However, when it came to deciding whether Murdoch made the admissions attributed to him by Sergeant Seeley, Captain Woodward and Lt. McCarthy, the Committee was not burdened by these troubling problems. It then became necessary only for the Committee to decide whether the

admissions in fact were made and, at most, whether they were probably true.

It is for these reasons that acceptance by the Commission of the prior dismissal of charge (a) as *res judicata* which foreclosed as a matter of law a finding of guilt on charges (b) and (c) was *legal* error, and when this concept was made a basis for the dismissal of charges (b) and (c) without regard to the proofs submitted in support of them, the appellant suffered manifest harm requiring reversal. *Cf. Finnegan v. Miller*, 132 *N. J. L.* 192, 195–196 (*Sup. Ct.* 1944). But see *Lubliner v. Bd. of Alcoholic Bev. Con., Paterson*, 33 *N. J.* 428, 437 (1960). In so concluding we find apposite in principle our holding in *Kavanaugh v. Quigley*, 63 *N. J. Super.* 153, 158 (*App. Div.* 1960), wherein we said:

"* * * if the trial judge misconceives the applicable law, or misapplies it to the factual complex, in total effect the exercise of the legal discretion lacks a foundation and becomes an arbitrary act, however conscientious may have been the judge in the performance of it."

In concluding our discussion of this point we make it clear that the ultimate evaluation of the credibility of the witnesses rests in the sound discretion of the Commission.

Appellant also attacks the legality of the hearers' action in accepting as proof that nothing had been stolen from the Garden Center, the testimony of Lt. McCarthy that in the course of his investigation he and a superior officer interviewed one Wesley Drake, manager of the Garden Center, who told them that "nothing was missing" from the store and again that "he didn't know if any was missing. He couldn't tell." Plainly this evidence was hearsay, and so should not have been admitted. *R. S.* 11:22–39. Drake did not testify as a witness either before the Township Committee or in the Civil Service proceeding, and the acceptance of his hearsay statement as proof of the fact was harmful error.

██ Lastly, appellant urges that the Commission erred in declining to permit the township attorney to cross-examine Murdoch on what is claimed to be a prior inconsistent statement. The right to so examine is so well established as to require no extensive citation of authority. See *Stoelting v. Hauck*, 32 *N. J.* 87, 106 (1960). However, the statement itself was not marked for identification, is not included in the appendix, and we are unable to say from our reading of the testimony that it was "inconsistent" with the testimony of the witness in material degree. In these circumstances, being unaware of the complete contents of the statement, we are unable to say that harmful error was committed.

The order of the Commission dismissing charges (d) and (e) is affirmed. The order insofar as it dismisses charges (b) and (c) is reversed, and the case is remanded to the Commission for specific findings of fact and conclusions of law with respect thereto, in conformity with this opinion. The Commission may *sua sponte* or on application of the parties, in the exercise of its discretion take such further testimony as it deems proper.

In this connection we suggest to the Commission that the ultimate disposition of these charges should not be controlled either by the philosophical observation that "the American way of life would be served no good" in finding Murdoch guilty, or by the fact that he has "served as a good police officer and that no stigma should be attached to his good name because of the alleged incident," as recited in the findings. If service to the "American way of life" is to be considered at all, it should be remembered that such service includes the obligation of every individual to obey the law, and to conform to regulations promulgated by a properly constituted authority, and that it includes also, evenhanded administration and enforcement of the law by those entrusted therewith, without regard to the prior good conduct of one charged with its violation. While prior good conduct of a miscreant frequently is considered

in fixing the extent of punishment, it should play no part whatever in the determination of the issue of guilt or innocence in a case such as this.

Remand.