127 N.J. Super. 13 (1974)
316 A.2d 39
IN THE MATTER OF THE TENURE HEARING OF PAULA M. GROSSMAN, A/K/A PAUL M. GROSSMAN, SCHOOL DISTRICT OF THE TOWNSHIP OF BERNARDS, SOMERSET COUNTY.
Superior Court of New Jersey, Appellate Division.
Argued January 15, 1974.
Decided February 20, 1974.
*18 Before Judges CARTON, SEIDMAN and DEMOS.
Mr. Richard J. Schacter argued the cause for appellant and cross-respondent Paula M. Grossman (Messrs. Halpern, Schacter & Wohl, attorneys; Mr. Lee Trucker, on the brief).
Mr. Gordon A. Millspaugh, Jr., argued the cause for respondent and cross-appellant Bernards Township Board of Education (Messrs. Young, Rose & Millspaugh, attorneys; Mr. Theodore Margolis, on the brief).
*19 Ms. Erminie L. Conley, Deputy Attorney General, argued the cause for the State Board of Education (Mr. George F. Kugler, Jr., Attorney General of New Jersey, attorney; Mr. Stephen Skillman, First Assistant Attorney General, of counsel).
The opinion of the court was delivered by SEIDMAN, J.A.D.
The principal issue in this novel case is whether a male tenured teacher who underwent sex-reassignment surgery to change his external anatomy to that of a female can be dismissed from a public school system on the sole ground that his retention would result in potential emotional harm to the students.
Paul Monroe Grossman, now 54 years of age, married, and the father of three children, was engaged as a teacher by the Bernards Township Board of Education in 1957 and received tenure in 1960. He taught vocal music in one of the elementary schools, primarily to fourth, fifth and sixth-grade children between the ages of 10 and 12.
For many years Grossman had had a gender identity problem which worsened with the passage of time until, shortly after his fiftieth birthday, he sought medical advice, commenced a course of treatment, and, in March 1971, had sex-reassignment surgery performed. He had been diagnosed as a transsexual; that is, one who anatomically is born with the genitalia of one sex but who believes himself (or herself) to be a member of the other sex.
Although Grossman had notified his superiors of his impending absence for surgery, he did not disclose its nature until his return in late April or May of 1971, when he informed the township superintendent of schools and made known his intention of remaining in the school system as a female. After completing the academic year in male attire, he assumed the name of Paula Miriam Grossman and began to live openly as a woman.
During the summer of that year the matter was under active and continuous consideration by the board, looking toward *20 a satisfactory resolution of the problem. A series of meetings took place between it and Mrs. Grossman (it seems appropriate to use the female gender henceforth), arrangements were made for her to be examined by board selected psychiatrists, and finally a proposal was submitted by the board to engage her on a one-year contract at the same pay to teach the same courses, but only on an elective basis in the high school, provided she would resign, thus relinquishing her tenure, and obtain a new teaching certificate in her female name. The offer was rejected.
On August 19, 1971 the board filed written charges against Mrs. Grossman and suspended her without pay. The charges, in substance, were: (1) her presence as a teacher had created and would continue to create a degree of sensation and notoriety within the system and the community which would severely impair the board's ability to conduct an efficient and orderly school system; (2) under the circumstances of the case, including the failure to disclose the condition and anticipated surgery, Mrs. Grossman had exhibited conduct unbecoming a teacher; (3) as a result of the sex-reassignment surgery, Mrs. Grossman underwent a fundamental and complete change in her role and identification, thereby rendering herself incapable of continuing to function as Paul Monroe Grossman, the person who had been engaged as a teacher by the board; (4) Mrs. Grossman exhibited conduct and behavior deviant from the acceptable standards of the community, and (5) she exhibited abnormality. Each of these charges, it was asserted, constituted just cause for dismissing her from the school system.
Pursuant to N.J.S.A. 18A:6-10 et seq. the charges were forwarded to the State Commissioner of Education. After a lengthy hearing before Assistant Commissioner William A. Shine, the third charge, on Dr. Shine's own motion and without objection, was amended to reflect an issue tried and argued but not specified in the statement of charges, as follows:
*21 Paul Monroe Grossman knowingly and voluntarily underwent a sex-reassignment from male to female. By doing so, he underwent a fundamental and complete change in his role and identification in society, thereby rendering himself incapable to teach children in Bernards Township because of the potential her (Grossman's) presence in the classroom presents for psychological harm to the students of Bernards Township. Therefore, Paula a/k/a Paul Monroe Grossman should be dismissed from the system by reason of just cause due to incapacity. [Emphasis supplied.]
The Commissioner found that the first charge was not supported by the evidence, noting, among other things, that despite evidence offered by the board of widespread newspaper and television publicity, threats of legal action by parents, and adverse reactions to Mrs. Grossman among the teachers and other personnel in the system, there was an absence of public protest at open board meetings during the summer of 1971, and, particularly, the board had offered to continue her employment on a limited basis in the high school. He deemed this inconsistent with the contention that disruption would occur if Mrs. Grossman should be retained in the school system.
He found that the charge of conduct unbecoming a teacher had also not been substantiated. Although, in his opinion, it would have been better had Mrs. Grossman taken the administration into her confidence, he concluded that the evidence did not support the charge that her behavior was a deliberate attempt to mislead her colleagues and the administration.
The Commissioner rejected as well the charges alleging deviant conduct and abnormality as not having been established by the weight of the evidence. He stressed the findings of three psychiatrists with unchallenged qualifications who had examined Mrs. Grossman at the requect of the board (which now attacks their reports for "gross insufficiency") and who concluded virtually unanimously that there was no evidence of physical or mental abnormality which would render Mrs. Grossman unable to pursue her profession as a teacher. As for the conduct allegedly "deviant from the accepted *22 standards of the community," the Commissioner, recognizing that "conventional standards are seriously affected in the instant matter," nevertheless refused to substitute his judgment for that of the experts who had examined Mrs. Grossman and found no abnormality serious enough to prevent her from teaching.
He concluded, however, that the amended thrid charge, which we shall discuss in more detail later, had been proved and that Mrs. Grossman was incapacitated to teach children because of potential psychological harm to the students. He directed that she be dismissed as a teacher in the Bernards Township school system "for reason of just cause due to incapacity."
Taking into account the unusual nature of the case and finding no moral turpitude, the Commissioner further directed the board to apply to the Teachers' Pension and Annuity Fund for a disability pension in behalf of Mrs. Grossman, pursuant to N.J.S.A. 18A:66-39 et seq. He also ordered the payment of her back pay based upon his interpretation of L. 1971, c. 435 (amending N.J.S.A. 18A:6-14).
Both sides appealed. The State Board of Education affirmed that portion of the decision ordering the dismissal of Mrs. Grossman (one member, however, being of the view that the evidence sustained the fourth and fifth charges) and also the direction for the application to the Teachers' Pension and Annuity Fund. With four members dissenting, the order to pay Mrs. Grossman's back salary was reversed.
Mrs. Grossman now appeals to this court from the order of dismissal and the denial of back pay. The local board cross-appeals from the rejection of the other four charges.

I
The scope of our review is clear with respect to the Commissioner's disposition of the five charges. The governing standard is, of course, whether the findings made could reasonably have been reached on sufficient credible evidence *23 present in the record, considering the proofs as a whole, with due regard to the opportunity of the one who heard the witnesses to judge of their credibility. Close v. Kordulak Bros., 44 N.J. 589, 598-599 (1965). If the factual findings are supported by competent evidence, they will be upheld. Atkinson v. Parsekian, 37 N.J. 143, 149 (1962); Clover Hill Swimming Club v. Goldsboro, 47 N.J. 25, 36 (1966); Szumski v. Dale Boat Yards, Inc., 48 N.J. 401, 410 (1967). It is not ordinarily our function to weigh the evidence, to determine the credibility of witnesses, to draw inferences and conclusions from the evidence, and to resolve conflicts therein. Mead Johnson and Co. v. South Plainfield, 95 N.J. Super. 455, 466 (App. Div. 1967). We have, though, the responsibility of determining whether pertinent principles of law were properly interpreted and applied to the facts as found by the trier thereof. See Jantausch v. Verona, 41 N.J. Super. 89, 96-97 (Law Div. 1956), aff'd 24 N.J. 326 (1957).
Mrs. Grossman argues that (1) it was error to hold that a tenured teacher may be dismissed for just cause due to incapacity solely upon evidence that the presence of the teacher in the classroom presented a possibility of emotional harm to some students, (2) the evidence adduced was insufficient to establish such emotional harm, and (3) hypothetical psychiatric testimony of such harm was not a sufficient ground for her removal. On its cross-appeal the board maintains that the other charges should have been sustained on the evidence presented.
Applying the above-mentioned standard of review to the board's contention that the first, second, fourth and fifth charges should not have been dismissed, we cannot say, after a thorough canvass of the record, that the Commissioner's findings as to them are so lacking in evidentiary support as to require modification or reversal. We are satisfied from the proofs in the case that there was a rational basis for the conclusions reached.
*24 As for the amended third charge, the Commissioner found from the evidence that Mrs. Grossman was "incapacitated to teach children in the situation described herein because of the potential her presence in the classroom presented for psychological harm to the students of Bernards Township." His decision must be measured by the same standard  that is, whether it was supported by sufficient credible evidence considering the entire record.
The testimony on that issue was in sharp conflict. Dr. Charles W. Socarides, a psychiatrist and psychoanalyst with extensive qualifications and experience in the treatment of sexual disorders, appeared in behalf of the board, as did Dr. Harvey Martin Hammer, a psychiatrist specializing in the treatment of children. Dr. Charles L. Ihlenfeld, a physician who described himself as board eligible but not certified in the field of internal medicine, appeared for Mrs. Grossman, and Dr. Robert W. Laidlaw, a well-qualified psychiatrist, testified in her behalf by deposition. Although much of what they said dealt with the nature and treatment of transsexualism as well as the propriety of sex-reassignment surgery, we are primarily concerned here with their views on the impact upon students of a teacher who has undergone such surgery.
Dr. Socarides, who considered transsexualism to be a psychiatric syndrome characterized by an overriding wish to be a person of the opposite sex, expressed the view that the presence in the school system of a transsexual teacher who had been sexually reassigned could create "some anxieties among those [young children] already predisposed due to their own inter-emotional conflicts over their castration fears and so forth." He said, further, that "since sexual gender role is of paramount significance in life, and its formation and helping it and its growth is so important, as I mentioned before, that such things could cause disturbance." The problems, he added, would be difficult to identify and measure by school authorities since some of the changes might be long-term *25 ones. On the subject of the relationship between a teacher and young children, Dr. Socarides said:
* * * [L]ooking at it from another point of view is that there is another side to this story and that is that the teacher's function as objects for identification and one of the major things in teaching is that we learn through identification with the teacher and very often we learn out of love for the teacher. And, boys not only learn their lessons in school but they learn how to be men from their teachers and they learn how to be men of certain types of character or personality or aspirations or they learn in a negative fashion. That's why the teacher is, perhaps, the highest profession * * * and it's this process of identification to young minds which  the whole liking for learning develops out of love for the teacher and identity with the teacher. * * * and I think it  if such sexual change were known, I think it would be very disruptive of that process, if that were known.
Dr. Hammer said that sexual identity problems, varying in severity, were commonplace in children. With respect to the impact of a sexually reassigned transsexual teacher whose former sexual identity was known to the children, it was his impression "that such an individual would have a very negative effect on the mental health of the children in the classroom." He cited, as an example, the case of a 14-year-old boy in the Bernards Township school system who had had a severe self-image problem and who suffered a set-back after learning of what had happened to Mrs. Grossman. He said, further, that a child's relationship with the teacher was a significant factor in the learning process and that when a teacher does not have psychological control over the children in the classroom potential learning aspects are diminished. It was his opinion that "it would be disadvantageous to the mental health of the children in the Bernards Township school system to have Mrs. Grossman reappear in her new gender as a teacher in that school system."
A contrary position was taken by Dr. Ihlenfeld, who testified that there would be no adverse effect on children who knew of Mrs. Grossman's sex change because their own sense of gender identity had been formed and fixed long before *26 they reached her classroom. He said further that "if a child should be so upset by the thought that Mrs. Grossman had surgery, then this may be the child who has a potential for developing a problem and should have counselling anyway."
Dr. Laidlaw was also of the opinion that Mrs. Grossman would have no significant effect on children aged 10 to 12 years who had known her as a man. While there might be initial "snickering or gossipping or wise-cracking," this, he said, would be transitory and would not detract from Mrs. Grossman's "effectiveness as a teacher on the children."
The Commissioner, acknowledging the conflicting evidence on the issue, found that the testimony of the experts was predicated on their differing concepts of the role of the teacher, with Dr. Socarides and Dr. Hammer both viewing the teacher as a "paradigmatic" person whose very presence in the classroom is instructive, whereas, to Dr. Ihlenfeld, a teacher in the classroom was merely another person from the outside world. He chose to accept Dr. Socarides's description of the role of a teacher, and he relied heavily on the testimony of Dr. Hammer in reaching his conclusion that Mrs. Grossman's presence in the classroom could potentially result in psychological harm to the students.
Mrs. Grossman argues that there was a lack of substantial evidence to support the Commissioner's conclusion and that the proofs did not warrant the removal of a teacher otherwise "found to be capable, efficient, and physically able to perform her duties." It is urged that there is little or no empirical data or evidence to indicate that psychological or emotional harm would result to the students of Bernards Township if Mrs. Grossman were allowed to teach in the school system.
It is not within our competency to balance the persuasiveness of the evidence on one side as against the other. The choice of accepting or rejecting the testimony of the witnesses rests with the administrative agency subject to our oversight of whether there was substantial, legal evidence to support the conclusions reached. Hornauer v. Div. of Alcoholic Beverage Control, 40 N.J. Super. 501, *27 506 (App. Div. 1956); Middletown Tp. v. Murdoch, 73 N.J. Super. 511, 515 (App. Div. 1962). The issue was thoroughly presented and argued by both sides. The Commissioner resolved the conflicting medical evidence in favor of the board. Understandably, in a case of this nature, most of the supporting evidence was in the form of opinions given by medical experts, as, indeed, was the opposing evidnece. We do not believe that those opinions were based on conjecture or speculation. We are convinced that the evidence adduced sustained as reasonably probable the board's hypothesis that there would be emotional harm to the students if Mrs. Grossman were retained in the school system. See Ciuba v. Irvington Varnish & Insulator Co., 27 N.J. 127, 139-140 (1958). Consequently, we will not disturb the Commissioner's finding.

II
Having reached the above conclusion, we must now determine whether the finding that Mrs. Grossman's retention as a teacher in Bernards Township schools would have an adverse emotional effect upon her students justifies her dismissal "for reason of just cause due to incapacity." Central to this issue is N.J.S.A. 18A:6-10, which provides in pertinent part that no person under tenure shall be dismissed "during good behavior and efficiency" except "for inefficiency, incapacity, unbecoming conduct, or other just cause." In the context of this case, the focal point among these grounds is "incapacity."
Mrs. Grossman's counsel argues that the word "incapacity," as used in the tenure statute, relates to the teacher's inability to teach in the classroom and not to his or her purported impact upon the "psyche" of the students as individuals. He further argues that since Mrs. Grossman did not lack the ability, professionally, physically or mentally, to continue to function as a teacher, and since no illegal, immoral or deviant act or conduct had been established, she cannot be dismissed *28 under the statute notwithstanding the finding that her presence in the classroom would have an adverse effect on the students. We think counsel's view of the statute is too narrow.
The term "incapacity," within the purview of the statute, has not received either precise definition or specific standards in this jurisdiction. However, in construing it we should not confine our attention to the term itself. We must examine it in the light of the statutory surroundings and objectives. See Ward v. Scott, 11 N.J. 117, 123 (1952). It should receive a reasonable and sensible interpretation, and should, moreover, be considered in conjunction with the words "just cause."
In Berardi v. Rutter, 42 N.J. Super. 39 (App. Div. 1956), aff'd sub nom. In re Berardi, 23 N.J. 485 (1957), the court said:
* * * [T]here are a considerable number of statutes throughout the country authorizing the removal of an officer or employee for "cause," and that under them "cause" is generally held to mean "just cause" or such cause as is "plainly sufficient under the law and sound public policy" (Haight v. Love, 39 N.J.L. 14, 22 (Sup. Ct. 1876), affirmed at 39 N.J.L. 476 (E. & A. 1877); Ayers v. Newark, 49 N.J.L. 170, 171, 172 (Sup. Ct. 1886); Brokaw v. Burk, 89 N.J.L. 132, 135 (Sup. Ct. 1916); Russo v. Meyner, 22 N.J. 156, 179, 181 (1956) Heher, J. in a dissenting opinion)), excluding therefore arbitrary or capricious action. Moreover, the term there is generally held to have reference to the office or employment or to its administration, Russo v. Meyner, supra, 22 N.J., at page 179; and many other cases in accord, some of which are cited in 43 Am. Jur. 47; 67 C.J.S. Officers § 60, p. 248; 46 C.J. 986; 4 McQuillin, Municipal Corporations (3rd ed.), 256, 257. * * * As thus defined, the term "cause" resembles in some respects the standard of "good character, competency and integrity" now under consideration. [42 N.J. Super. at 47 emphasis supplied]
Dismissal of teachers for "inefficiency, incapacity, conduct unbecoming a teacher or other just cause," as found in N.J.S.A. 18A:6-10, has been held to provide a sufficient standard which, though "general in terms but measured by common understanding * * * fairly and adequately conveys *29 its meaning to all concerned." Laba v. Newark Board of Education, 23 N.J. 364, 384 (1957). It is clear from a reading of that case that the touchstone is fitness to discharge the duties and functions of one's office or position.
It is true that Mrs. Grossman's proficiency as a teacher is not in question and, as noted previously, she had been found physically and mentally competent to teach. It is also true that misconduct on her part has not been established. Although dictum in School Dist. Wildwood v. State Board of Education, 116 N.J.L. 572 (Sup. Ct. 1936), suggests that dismissals should be limited to proof of some form of dereliction on the part of the teacher, there is neither case nor statutory law so restricting the power of the Commissioner under N.J.S.A. 18A:6-10.
The problem to be resolved is whether "incapacity" of a teacher, as that term is used in the statute, can be established solely by a finding that the teacher will have an adverse effect upon the students in the classroom.
"Incompetency," a term closely allied to "incapacity," was defined in Horosko v. Mt. Pleasant School District, 335 Pa. 369, 6 A.2d 866 (Sup. Ct. 1939), cert. den. 308 U.S. 553, 60 S.Ct. 101, 84 L.Ed. 465 (1939):
The term "incompetency" has a "common and approved usage." The context does not limit the meaning of the word to lack of substantive knowledge of the subjects to be taught. Common and approved usage give a much wider meaning. For example, in 31 C.J., with reference to a number of supporting decisions, it is defined: "A relative term without technical meaning. It may be employed as meaning disqualification; inability; incapacity; lack of ability, legal qualifications, or fitness to discharge the required duty." In Black's Law Dictionary, 3rd edition, page 945, and in 1 Bouv. Law Dict., Rawle's Third Revision, p. 1528, it is defined as "Lack of ability or fitness to discharge the required duty." * * * Webster's New International Dictionary defines it as "want of physical, intellectual, or moral ability; insufficiency; inadequacy; specif., want of legal qualifications or fitness." Funk & Wagnall Standard Dictionary defines it as "General lack of capacity of fitness, or lack of the special qualities required for a particular purpose." [6 A.2d at 869-870; emphasis supplied]
*30 Thus, "incapacity," like "incompetency," is directly related to fitness to teach, a factor recognized as relevant in Laba v. Newark Board of Education, supra, 23 N.J. at 385-388. See also, Board of Public Education School Dist. v. Beilan, 386 Pa. 82, 125 A.2d 327 (Sup. Ct. 1956), aff'd sub. nom. Beilan v. Board of Education, School Dist. of Phila., 357 U.S. 399, 78 S.Ct. 1317, 2 L.Ed.2d 1414 (1958). But fitness to teach is not based exclusively on a teacher's classroom proficiency or the absence of misconduct. It depends upon a broad range of factors. Beilan v. Board of Education, School Dist. of Phila., supra, 78 S.Ct. at 1322. One of those factors, we have no doubt, must be the teacher's impact and effect upon his or her students, for as was said in Adler v. Board of Education of City of New York, 342 U.S. 485, 72 S.Ct. 380, 96 L.Ed. 517 (1952):
* * * A teacher works in a sensitive area in a schoolroom. There he shapes the attitude of young minds toward the society in which they live. In this, the state has a vital concern. That the school authorities have the right and the duty to screen the officials, teachers, and employees as to their fitness to maintain the integrity of the schools as a part of ordered society, cannot be doubted. [342 U.S. at 493; 72 S.Ct. at 385]
A like concern has been voiced by our own courts. It has been held that an "inefficient and incapable principal may do great injury to both pupils and teachers." Redcay v. State Board of Education, 130 N.J.L. 369, 370 (Sup. Ct. 1943). In another context, when dealing with the proper penalty to be imposed upon a teacher charged with unbecoming conduct, we enjoined the Commissioner to "take into consideration any harm or injurious effect which the teacher's conduct may have had on the maintenance of discipline and the proper administration of the school system." In re Fulcomer, 93 N.J. Super. 404, 422 (App Div. 1967). And in Kochman v. Keansburg Bd. of Ed., 124 N.J. Super. 203, 212 (Ch. Div. 1973), involving a section of the education law which required board of education employees to undergo physical examinations *31 at least once a year, the court observed that the Legislature "is concerned with protecting school children from the influence of unfit teachers."
A recent group of California cases has emphasized the importance of the question of fitness in the relationship between teacher and student, with particular reference to the impact the former makes on the latter.
In Morrison v. State Board of Education, 1 Cal.3d 214, 82 Cal. Rptr. 175, 461 P.2d 375 (Sup. Ct. 1969), the issue was whether a teacher who had been involved in an isolated, noncriminal, homosexual relationship was subject to disciplinary action under a California statute authorizing revocation of a teacher's life diploma for immoral conduct. The Supreme Court of that state concluded that the school board could not abstractly characterize the conduct in the case as "immoral," "unprofessional" or "involving moral turpitude" unless that conduct indicated unfitness to teach. The court went on to delineate standards by which unfitness to teach may be determined:
In determining whether the teacher's conduct thus indicates unfitness to teach the board may consider such matters as the likelihood that the conduct may have adversely affected students or fellow teachers, the degree of such adversity anticipated, the proximity or remoteness in time of the conduct, the type of teaching certificate held by the party involved, the extenuating or aggravating circumstances, if any, surrounding the conduct, the praiseworthiness or blame-worthiness of the motives resulting in the conduct, * * * These factors are relevant to the extent that they assist the board in determining a teacher's fitness to teach, i.e., in determining whether the teacher's future classroom performance and overall impact on his students are likely to meet the boards' standards. [82 Cal. Rptr. at 186-187, 461 P.2d at 386-387; emphasis supplied]
The court concluded:
* * * Thus an individual can be removed from the teaching profession only upon a showing that his retention in the profession poses a significant danger of harm to either students, school employees, or others who might be affected by his actions as a teacher. * * * [Id. at 191, 461 P.2d at 391; emphasis supplied]
*32 In Board of Trustees of Compton Jr. Col. Dist. v. Stubblefield, 16 Cal. App.3d 820, 94 Cal. Rptr. 318, 321 (D. Ct. App. 1971), the court said:
* * * [T]he calling [of a teacher] is so intimate, its duties so delicate, the things in which a teacher might prove unworthy or would fail are so numerous that they are incapable of enumeration in any legislative enactment. * * * His habits, his speech, his good name, his cleanliness, the wisdom and propriety of his official utterances, his associations, all are involved. His ability to inspire children and to govern them, his power as a teacher, and the character for which he stands are matters of major concern in a teacher's selection and retention. [94 Cal. Rptr. at 321; emphasis supplied.]
See also, Watson v. State Board of Education, 22 Cal. App. 3d 559, 99 Cal. Rptr. 468 (D. Ct. App. 1972); Comings v. State Board of Education, 23 Cal. App.3d 94, 100 Cal. Rptr. 73 (D. Ct. App. 1972).
We think it would be wrong to measure a teacher's fitness solely by his or her ability to perform the teaching function and to ignore the fact that the teacher's presence in the classroom might, nevertheless, pose a danger of harm to the students for a reason not related to academic proficiency. We are convinced that where, as has been found in this case, a teacher's presence in the classroom would create a potential for psychological harm to the students, the teacher is unable properly to fulfill his or her role and his or her incapacity has been established within the purview of the statute. In fairness to Mrs. Grossman, we emphasize that the Commissioner's conclusions relate only to her fitness to continue teaching in the Bernards Township school system. We express no opinion with respect to her fitness to teach elsewhere and under circumstances different from those revealed in the present case.

III
It is contended, further, that since the Commissioner raised the possibility of Mrs. Grossman's being disabled within the meaning of the Teachers' Pension Law, N.J. *33 S.A. 18A:66-1 et seq., he should first have referred the matter to the board of trustees of the pension fund. The fear is voiced that the Commissioner's decision to order Mrs. Grossman's dismissal and, at the same time, to direct the board to submit a disability retirement application in her behalf, presents an irreconcilable inconsistency. We do not agree.
The board of trustees of the pension fund and the Commissioner of Education constitute separate administrative agencies, each with a mutually exclusive area of expertise and authority. See Bd. of Trustees of Teachers' Pension, etc. v. La Tronica, 81 N.J. Super. 461, 468 (App. Div. 1963), certif. den. 41 N.J. 587 (1964). Moreover, the subject matters within each sphere of jurisdiction, i.e., dismissal and retirement, are distinct. Cf. Jacobs v. N.J. State Highway Authority, 54 N.J. 393, 397 (1969). Thus, in arriving at their respective administrative determinations, each agency might employ different factors bearing upon the claimed incapacity or disability of a teacher. Cf. Russo v. Teachers' Pension and Annuity Fund, 62 N.J. 142, 146 (1973). For example, while the Commissioner deemed Mrs. Grossman unfit to teach in the Bernards Township school system within the context of dismissal, the board of trustees might consider, within the retirement context, whether she is incapable of teaching in any capacity in any school district. Moreover, the determination by the board of trustees might be based upon whether the teacher is, in fact, mentally or physically unfit to perform the required duties, and not upon whether the teacher is unfit to perform in the context of the teacher-student relationship.

IV
We perceive no merit in the argument that Mrs. Grossman's "constitutional rights to equal protection of the laws have been violated by the application of standards resulting in her dismissal where the same standards are not applied to other teachers in the same school system." It has not *34 been demonstrated that the standard of unfitness based upon a teacher's adverse emotional effect upon students would not be applied to other teachers if the facts warranted such result.
The contention that the board violated Mrs. Grossman's rights to equal protection by not seeking a declaration of disability is specious.

V
The last issue to be decided is whether Mrs. Grossman was entitled to back pay pursuant to L. 1971, c. 435, which became effective February 10, 1972, subsequent to her suspension but prior to the Commissioner's decision on April 10, 1972. It will be recalled that the Commissioner held that she was and that the State Board of Education reached a contrary conclusion.
Mrs. Grossman was suspended without pay by the local board on August 19, 1971, pursuant to the authority granted by N.J.S.A. 18A:6-14, which at that time provided as follows:
Upon certification of any charge to the commissioner, the board may suspend the person against whom such charge is made, with or without pay, pending final determination of the same, and if the charge is dismissed, the person shall be reinstated immediately with full pay as of the time of such suspension.
The amendatory statute (L. 1971, c. 435) added a new section, designated as N.J.S.A. 18A:6-8.3, providing, in pertinent part, that:
Any employee or officer of a board of a board of education * * * who is suspended * * * pending any * * * hearing or trial or any appeal therefrom, shall receive his full pay or salary during such suspension, except that in the event of charges * * * brought before the board of education or the Commissioner of Education pursuant to law, such suspension may be with or without pay or salary. * * *
*35 It also amended N.J.S.A. 18A:6-14 by providing, to the extent pertinent here, that in case the board, upon certification of any charge to the Commissioner, suspends the person against whom the charge is made:
* * * [I]f the determination of the charge is not made within 120 calendar days after certification of the charges * * * then the full salary (except for said 120 days) * * * shall be paid * * * until such determination is made. * * * Should the charge be dismissed and the suspension be continued during an appeal therefrom, then the full pay or salary of such person shall continue until the determination of the appeal. * * * Should the charge be sustained on the original hearing or an appeal therefrom, then the suspension may be continued unless and until such determination is reversed, in which event he shall be reinstated immediately with full pay as of the time of such suspension.
The question is whether, as Mrs. Grossman contends and the Commissioner decided, the amendatory statute is to be given retroactive effect, or whether, as is implicit in the reversal by the State Board of Education, it is applicable only to those suspended after its effective date.
Generally, statutes relating to substantive rights are construed to operate prospectively, in the absence of a clear expression of opposite intent, whereas statutes relating to procedure and remedy are applicable to pending proceedings where vested rights would not be disturbed or obligations of contracts impaired. Neel v. Ball, 6 N.J. 546, 551 (1951); 2 Sutherland, Statutory Construction (3 ed. 1943), § 2210 at 129-130. In our view, the amendment involved in this case, which has the effect of limiting the period of time during which a teacher (or other board employee) can be suspended without pay, is procedural and remedial, and not, as the board contends, substantive. The cases on which it relies, such as Nichols v. Jersey City Board of Education, 9 N.J. 241 (1952), and Kopczynski v. Camden County, 2 N.J. 419 (1949), are inapposite.
We see no sound reason for not applying the amendment to cases pending on its effective date. It seems clear that in enacting it the Legislature must have had in mind the economic *36 hardship endured by teachers and other board of education employees suspended without pay pending the outcome of charges filed against them and certified for hearing to the Commissioner of Education. We are certain, moreover, of the Legislature's awareness that in many instances, because of the volume of matters awaiting hearing, a prompt disposition of charges is not feasible. Thus, the obvious intent and purpose of the amendment was to alleviate the financial plight of those affected by providing for the payment of their full salary (less sums received from other employment during suspension) from the 121st day following the certification of charges until the determination thereof by the Commissioner, or in the case of an appeal by a board from a decision adverse to it, until the determination of the appeal.
No vested rights or contractual obligations would be jeopardized by a retroactive application of the amendment to cases such as the one now before us. Furthermore, "[t]here is sound authority * * * for the proposition that when a statute is ameliorative, as this one can be considered to be, it may be applied retroactively. People v. Oliver, 1 N.Y.2d 152, 151 N.Y.S.2d 367, 134 N.E.2d 197 (Ct. App. 1956)." In re Smigelski, 30 N.J. 513, 527 (1959).
Permitting Mrs. Grossman to have her back pay to the extent permitted by the amendment would be fair and just and consistent with the clear objective of the law.

VI
That part of the decision of the State Board setting aside the Commissioner's direction for payment of Mrs. Grossman's back salary is reversed. The matter is remanded to the Commissioner for a determination of the amount of salary due Mrs. Grossman from the 121st day following the certification of charges to April 10, 1972, less any sums by way of pay or salary received by Mrs. Grossman from substituted employment assumed during her period of suspension.
In all other respects, the determination of the State Board is affirmed.