995 A.2d 826

IN THE MATTER OF THE TENURE HEARING OF GILBERT
YOUNG, JR., DISTRICT OF THE BOROUGH OF
ROSELLE, UNION COUNTY.

Argued February 23, 2010—Decided May 12, 2010.

Rivera–Soto, J., filed a dissenting opinion.

———

*Louis P. Bucceri,* argued the cause for appellant Gilbert Young, Jr., (*Bucceri & Pincus,* attorneys).

*Stephen J. Edelstein,* argued the cause for respondent Roselle Board of Education (*Schwartz Simon Edelstein Celso & Zitomer,* attorneys; *John E. Croot,* of counsel; *Mr. Croot* and *Ariel S. Peikes,* on the briefs).

*Michelle Lyn Miller,* Deputy Attorney General, argued the cause for respondent Commissioner of Education (*Paula T. Dow,* Attorney General of New Jersey, attorney; *Andrea M. Silkowitz,* Assistant Attorney General, of counsel; *Susan M. Huntley,* Deputy Attorney General, on the briefs).

Justice LONG delivered the opinion of the court.

The School District of the Borough of Roselle removed Gilbert Young, Jr. from his employment as a tenured teacher based on a finding of conduct unbecoming and other just cause predicated on allegations that he engaged in improper sexual contact with a minor student. The tenure charges were filed based on the accusations of C.W., a former student of Young's, who claimed that he and Young engaged in sexual activity on two occasions. Prior to the District having filed the tenure case, the Department of Children and Families (DCF) made an independent determination that the charges were unfounded.

On this appeal we are asked to interpret *N.J.S.A.* 18A:6–7a to determine whether it precludes a school district from taking disciplinary action against a teacher after DCF has found that a complaint of child abuse or neglect against that teacher is unfounded. We hold that *N.J.S.A.* 18A:6–7a does not bar the later institution of disciplinary charges against a teacher where DCF has investigated and declared allegations of child abuse unfounded.

I.

Gilbert Young, Jr. was a certified and tenured teacher in the School District of the Borough of Roselle, Union County (District). On February 15, 2007, a former student of Young's, C.W., was visiting the high school nurse in her office and told the nurse

about an alleged sexual incident with Young. After school officials were contacted, the police were notified and responded to the school. C.W. gave a preliminary statement to the police. The accusation related to events occurring during the 2004–2005 school year, although at the time of the investigation, C.W. stated to the police that the timeframe of the alleged abuse was in January or February 2005.[1]

On February 15, 2007, C.W.'s vice-principal called DCF to inform the agency about C.W.'s accusations against Young. DCF began its investigation of the charges of sexual abuse, interviewing, among other witnesses, C.W., his mother and Young. On May 9, 2007, DCF issued a written report finding C.W.'s allegations to be unfounded, stating:

Sexual Abuse/Sexual Penetration was unfounded regarding the actions of the Teacher Gilbert Young, in accordance with N.J.S.A. 9:6–8.21. [C.W.] sustained no injuries as a result of this incident. Although [C.W.] reported that he and Mr. Young engaged in sexual genital contact on one occasion, there was not enough information gathered to corroborate the allegations. The actions of Gilbert Young placed [C.W.] at no risk of harm and were not to the degree required by statu[t]e to find sexual abuse.

On October 11, 2007, the District filed tenure charges against Young with the Department of Education, Bureau of Controversies and Disputes (Department) under the Tenure Employees Hearing Law, N.J.S.A. 18A:6–10 to –18.1. The charges sought to remove Young from his employment as a tenured teacher for "unbecoming conduct or other just cause." The two charges were as follows:

Charge I

In or about December 2004 or January 2005, Young drove C.W. home after school on a couple of occasions. On one such trip, Young drove C.W. to Warinanco Park instead of bringing him home. It was dark at the time. Young turned off the motor and kissed C.W., putting his tongue in his mouth. He also caressed and touched his body, including his genitals, over his clothing. After 15 or 20 minutes, Young drove C.W. to a location near C.W.'s house and dropped him off.

---

[1] The prosecutor's office declined to prosecute Young because at the time of the alleged sexual incident C.W. was sixteen years old and Young was not currently his teacher.

> The foregoing conduct by Young constitutes conduct unbecoming a teaching staff member and/or other just cause for dismissal.
>
> Charge II
>
> In or about January or February 2005, C.W. was staying at his grandmother's home in Irvington, New Jersey for a weekend visit. Young telephoned at approximately 5:30 a.m. and informed C.W. that he would pick him up in front of the house. Shortly thereafter, Young arrived and C.W. left with him in Young's vehicle. After stopping at a CVS store in Roselle to pick up a prescription for Young's daughter, they proceeded to the daughter's house to drop it off, and then to the Linden Motor Inn.
>
> After checking in, Young parked the car and he and C.W. entered a room at the Inn. Shortly thereafter, Young and C.W. disrobed and started kissing. They eventually engaged in oral and anal sex. Later, Young drove C.W. back to his grandmother's house. The foregoing conduct by Young constitutes conduct unbecoming a teaching staff member and/or other just cause for dismissal.

On October 25, 2007, Young filed an answer, denying the charges and asserting affirmative defenses. The Department then transmitted this matter to the Office of Administrative Law (OAL), where it was filed on October 29, 2007, for hearing as a contested case pursuant to *N.J.S.A.* 18A:6–11 and *N.J.S.A.* 52:14B–2(b). Prior to the hearing, Young filed a motion to dismiss all charges pursuant to *N.J.S.A.* 18A:6–7a. He claimed that the complaint investigated by DCF, which was determined to be unfounded, precluded the District from bringing tenure charges predicated upon the same allegations. The Administrative Law Judge (ALJ) reserved decision on the motion until the completion of the hearing.

At the hearing, the following testimony was adduced regarding the first charge. Young first met C.W. in January of 2002 when C.W. entered the District as a seventh grader and was assigned to Young's mathematics class. Young testified that later that school year, he referred C.W. to the Pupil Assistance Committee (PAC), comprised of several school staff members, to assist C.W. with academic and behavioral issues. During the PAC's meeting with C.W., Young brought C.W. into the hallway, at which point C.W. told Young that he was a homosexual and that he was engaged in internet communications with an older male. Young encouraged C.W. to share this information with the entire PAC and C.W.

complied. C.W.'s biological parents attended the next PAC meeting. C.W.'s mother told the PAC that her concern was how to improve C.W.'s academic performance; as such, Young volunteered to tutor C.W. after school. C.W. participated in Young's tutoring group through the end of the 2001–2002 school year. Young also testified that the following school year C.W. entered the eighth grade, which was housed two blocks away, and he continued to attend tutoring sessions with Young. During the 2004–2005 school year, when C.W. was in tenth grade, he continued to visit Young in his classroom after school a few times a week. C.W. would usually do his homework and then walk home.

On October 22, 2004, C.W. left a handwritten note for Young that stated "I love you daddy" and had X's and O's written on it. Young conferred with a colleague and decided not to report the note to school administrators or to C.W.'s parents. Young informed C.W. that the note was inappropriate and told him not to give him a similar note again. However, on November 5, 2004, C.W. wrote Young a similar note that also expressed his love. Young did not report the note, and again told C.W. that the note was inappropriate and to stop writing such notes. C.W. denied that Young told him not to give him notes.

Also during the fall of 2004, C.W. called Young and sent him text messages. Young explained that he gave his cell phone number to students whom he tutored in case they needed to be let into the school building because the tutoring sessions were held after regular school hours and the door to the school was at times locked. However, Young testified that he did not give his phone number to C.W.; rather, C.W. obtained the number on an occasion when Young left the classroom and left his cell phone on the desk. C.W. called Young and told him how he obtained the phone number; Young responded by telling C.W. not to call him again. However, during the fall of 2004, C.W. called Young and told him that he had just gotten out of the shower and had a towel wrapped around him. Young did not report that phone conversation to

school officials. Young also received two or three text messages from C.W. that he did not report.

Whether at the request of C.W.'s mother, as Young claimed, or of C.W. himself, as C.W. claimed, Young drove C.W. home from tutoring on several occasions. C.W. claimed that in or about December 2004, during one of the rides, Young drove C.W. into Warinanco Park, parked his vehicle and began groping C.W. by placing his hands on C.W.'s genitalia over C.W.'s clothing. Young then turned C.W.'s face towards him and kissed C.W. Young denied the incident ever occurred. Young claimed that he stopped tutoring C.W. in November 2004 because C.W. no longer came to see him and that the last time he drove C.W. home was in November 2004.

The facts that comprise the second charge against Young are similarly in dispute. Young testified that on December 31, 2004, he was at church and received a call from his daughter asking him to pick up medicine for her son. After locking the church, Young left and went home. Upon arriving home, Young made telephone calls, including one to his daughter. Around 2:00 a.m., Young was on his way to the CVS pharmacy when he received a phone call from C.W. asking for a ride to his grandmother's house. Young refused and told C.W. that he was on his way to the CVS pharmacy to pick up a prescription for his daughter. Young returned home, made additional phone calls, and went to bed around 3:30 a.m. Young's daughter, NaTia, called Young around 6:15 a.m. to tell him that his two nephews had a fight and that one of the nephews hit NaTia in her face. Young went to NaTia's apartment and when he arrived around 6:45 a.m., the police were already there.

Young testified that NaTia was upset and had been crying. Young took NaTia to the Linden Motor Inn, which was less than a mile from NaTia's apartment, so that she could rest and not be concerned about his nephew showing up. Young explained that he was concerned for NaTia's safety, even though his nephew inadvertently hit NaTia and she was not bruised. Young did not want

to bring NaTia to his house because Young's nephew would often sleep in his attic; however, the nephew did not have a key to the house.

Young testified that as he was pulling into the driveway of the Linden Motor Inn his cell phone rang and it was C.W. asking for a ride. Young responded, "Look boy, I am at the Linden Motor Inn in a crisis with my daughter I don't have time for this," and hung up the phone. Young then filled out registration cards that said the check-in time was 7:10 a.m., and paid for a two-hour stay. While NaTia remained at the motel, Young went to pick up his grandchildren from NaTia's neighbor. Young then picked up NaTia around 9:00 a.m. and took her back to his house.

Young's telephone records showed several calls made and received during the early-morning hours of January 1, 2005. Young claimed that the call he received at 2:02 a.m. was from C.W. asking for a ride while Young was on his way to a CVS pharmacy. According to Young, the call at 6:17 a.m., which appeared on the bill as "incoming" with no telephone number designated, came from his daughter, who was calling about the altercation. He claimed that the call at 7:06 a.m., which again appeared only as "incoming" with no telephone number designated, came from C.W. again asking for a ride. The phone records also showed that between 7:06 a.m. and 8:59 a.m., Young neither made nor received any calls. Young stated that after he received the telephone call from C.W. while pulling into the motel, he never again received a telephone call or text message from C.W.

NaTia testified about the events of the night of December 31, 2004, and the early-morning hours of January 1, 2005. She corroborated Young's statements about her calling Young to pick up a prescription, the altercation between Young's nephews and her being inadvertently hit, Young's coming to her home around the time the police were there, dropping her children off at her neighbor's, going to the motel, and Young's receiving a call en route to the motel. NaTia's neighbor also testified that in the early hours of January 1, 2005, NaTia, who was crying, dropped

her children off with her and Young picked the children up later that same morning.

C.W. testified to a very different set of events that occurred on January 1, 2005. C.W. testified that on December 31, 2004, he had been out with his father and his father dropped him off at his grandmother's house in Irvington around 1:00 or 2:00 a.m. C.W. said he called Young around 5:00 or 6:00 a.m. and that Young, who had just arrived home from church, agreed to call C.W. back. Pursuant to a later conversation between the two that morning, Young drove to C.W.'s grandmother's house around 6:00 a.m. and picked up C.W. Young then drove to a CVS drug store in Roselle, where he got medication for his daughter. He then drove to his home and went inside, while C.W. remained in the car. About five minutes later, they drove to Young's daughter's apartment. C.W. described the location of both Young's and his daughter's residences. C.W. testified that once they arrived at Young's daughter's apartment he stayed in the car, and Young brought the medicine inside. About five minutes later, Young returned and they drove to the Linden Motor Inn. Young checked in and then the two entered a room on the first floor. While there, Young performed oral and anal sex on C.W., which C.W. claims he initially resisted but after Young would not let go, he did not resist further. C.W. then informed Young that he wanted to go home, after which Young got dressed and returned C.W. to his grandmother's house in Irvington. After that event, C.W. testified that he did not have any further contact with Young, except one time when C.W. saw Young while he was visiting the high school.

At the hearing, a detective from the Roselle Police Department testified that because C.W. initially could not remember the name of the motel, on February 21, 2007, officers made a surprise visit to C.W.'s high school and took C.W. out of class and asked him to lead them to the motel. C.W. then directed them to the Linden Motor Inn, which was located about two or three miles from Roselle. Although C.W. did not know the name of the motel, he knew where it was located. When the officers pulled into the

motel driveway, C.W. directed them to the back parking lot. He then pointed to a room on the first floor where the alleged incident occurred. The officer noted that the entry into the room was from the outside of the building. The police then procured a receipt signed by Young for Room 106 from 7:10 to 9:10 a.m., on January 1, 2005. The police later confirmed that the license plate number on the receipt matched Young's vehicle.

As a preliminary matter, the ALJ found "that *N.J.S.A.* 18A:6–7a did not inhibit the District from bringing tenure charges for unbecoming conduct and other just cause" because "nothing in the statute precludes charges separate and apart from 'child abuse or neglect' as the basis for tenure charges." Additionally, the ALJ determined that the District did not rely on the DCF investigation at the hearing but "produced its own witnesses and documents in support of its charges, focusing on the conduct of [Young], which had a tendency to destroy public respect and confidence."

The ALJ also made credibility assessments, finding the testimony of C.W. to be "credible and compelling" as he "was clear and straightforward in recounting the events involved [and] had nothing to gain by his testimony and no evidence of ill will or ill motive was presented." The ALJ also found the investigating detective to be "compelling and credible." In contrast, the ALJ considered Young "lacking in credibility" for the following reasons:

> His accounts of disclosing his trips to C.W., one to the CVS pharmacy and the other to the Linden Motor Inn, were totally incredulous. His daughter's testimony was similarly not believable in light of the several inconsistencies between her testimony and his. Both claimed it was his or her own idea for her to go to a motel, they were at odds about when she was to be picked up at the motel, and she could not recall the exterior of the motel, when, according to her, the events leading her to the motel were traumatic. Equally incredulous was that [Young], who only lived a short distance from his daughter's apartment, took his daughter to a motel rather than to his house, because of "concerns" about his nephew, R.C., who had accidentally hit his daughter and who had no key or other access to [Young's] home.
>
> Of compelling importance was the lack of testimony from the police officer who was present at NaTia Young's apartment during the early-morning hours of January 1, 2005. NaTia Young claimed that he arrived at the same time as [Young]. [Young] also claimed that while he was there, he spoke with the officer.

Yet that officer never testified to corroborate [Young's] presence at the apartment, nor was anything mentioned in his police report about [Young's] presence.

The ALJ concluded that the District met its burden on the charges of conduct unbecoming and other just cause, and that although Young was not prosecuted criminally and the allegations of sexual abuse/sexual penetration were not substantiated by DCF, his "actions were violative of the trust placed in him as a teacher. His conduct, both in the park and at the motel, was not the 'high degree of exemplary behavior' expected of him [(internal citation omitted)]." Accordingly, the ALJ recommended that Young be removed from his teaching position.

The Commissioner of Education (Commissioner) adopted the ALJ's decision, sustaining the tenure charges and terminating Young's employment. In doing so, the Commissioner responded in detail and rejected all of Young's exceptions that challenged the ALJ's credibility determinations as arbitrary, capricious and not based on substantial evidence, and asserted that the District did not carry its burden to prove the charges.

Additionally, the Commissioner rejected Young's statutory preclusion challenge, noting that no action was taken against Young as a result of the DCF investigation and that the tenure case was based on facts generated by an independent police investigation that was more thorough than the DCF investigation and on information collected by the Roselle Board of Education (Board) in anticipation of tenure charges.

The Appellate Division affirmed the Commissioner's final determination, also finding that *N.J.S.A.* 18A:6–7a did not preclude the filing of tenure charges in this matter; that "there was substantial credible evidence in the record as a whole to support the agency's findings"; and that there was "no improper shifting of the burden of proof or other legal error that would justify disturbing the agency's determination."

We granted Young's petition for certification, 201 *N.J.* 145, 988 *A.*2d 565 (2009), and now affirm.

## II.

At the heart of this case is Young's claim that *N.J.S.A.* 18A:6–7a requires the dismissal of the tenure charges against him. To resolve that question of interpretation, some basic principles come into play. When interpreting a statute, our main objective is to further the Legislature's intent. *Bosland v. Warnock Dodge, Inc.,* 197 *N.J.* 543, 553, 964 *A.*2d 741 (2009) (citing *D'Annunzio v. Prudential Ins. Co. of Am.,* 192 *N.J.* 110, 119, 927 *A.*2d 113 (2007); *Daidone v. Buterick Bulkheading,* 191 *N.J.* 557, 565, 924 *A.*2d 1193 (2007)). To discern the Legislature's intent, courts first turn to the plain language of the statute in question. *DiProspero v. Penn,* 183 *N.J.* 477, 492, 874 *A.*2d 1039 (2005) (citing *Lozano v. Frank DeLuca Constr.,* 178 *N.J.* 513, 522, 842 *A.*2d 156 (2004)). In reading statutory language, courts will give words their ordinary meaning absent any direction from the Legislature to the contrary. *Serv. Armament Co. v. Hyland,* 70 *N.J.* 550, 556, 362 *A.*2d 13 (1976) (citing *Safeway Trails, Inc. v. Furman,* 41 *N.J.* 467, 487, 197 *A.*2d 366 (1964)). "If the plain language leads to a clear and unambiguous result, then [the] interpretive process is over." *Richardson v. Bd. of Trs., Police & Firemen's Ret. Sys.,* 192 *N.J.* 189, 195, 927 *A.*2d 543 (2007) (citing *DiProspero, supra,* 183 *N.J.* at 492, 874 *A.*2d 1039).

Where the plain meaning does not point to a "clear and unambiguous result," the court then considers extrinsic evidence from which it may glean the Legislature's intent. *Bedford v. Riello,* 195 *N.J.* 210, 222, 948 *A.*2d 1272 (2008) (citing *DiProspero, supra,* 183 *N.J.* at 492–93, 874 *A.*2d 1039). Included within the extrinsic evidence rubric are legislative history and statutory context, which may shed light on the drafters' motives. *Aponte–Correa v. Allstate Ins. Co.,* 162 *N.J.* 318, 323, 744 *A.*2d 175 (2000) (citing *Twp. of Pennsauken v. Schad,* 160 *N.J.* 156, 170, 733 *A.*2d 1159 (1999)). Likewise, interpretations of the statute and cognate enactments by agencies empowered to enforce them are given substantial deference in the context of statutory interpretation. *Matturri v. Bd. of Trs., Judicial Ret. Sys.,* 173 *N.J.* 368, 381, 802

*A*.2d 496 (2002) (citing *R & R Mktg., LLC v. Brown–Forman Corp.*, 158 *N.J.* 170, 175, 729 *A*.2d 1 (1999)).

Even when the language of the statute is ambiguous and

the Legislature has not addressed the precise question of statutory meaning, [we]

may not simply impose [our] own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

[*Id.* at 381–82, 802 *A*.2d 496 (alterations in original) (quoting *Kasper v. Bd. of Trs., Teachers' Pension and Annuity Fund,* 164 *N.J.* 564, 581, 754 *A*.2d 525 (2000) (citation omitted)).]

Regardless of the materials relied upon and the analytical tools employed, in the final analysis, courts should "seek to effectuate the 'fundamental purpose for which the legislation was enacted.'" *Schad, supra,* 160 *N.J.* at 170, 733 *A*.2d 1159 (quoting *N.J. Builders, Owners & Managers Ass'n v. Blair,* 60 *N.J.* 330, 338, 288 *A*.2d 855 (1972)).

## III.

An overview of the statutes that cover DCF investigations and tenure charges and how those statutes relate to one another is instructive. New Jersey mandates reporting suspected child abuse to DCF. *N.J.S.A.* 9:6–8.10 ("Any person having reasonable cause to believe that a child has been subjected to child abuse or acts of child abuse shall report the same immediately to the Division of Youth and Family Services by telephone or otherwise."). A teacher constitutes a "parent or guardian" under Title 9. *N.J.S.A.* 9:6–8.21(a). According to *N.J.S.A.* 9:6–8.21(c), an "abused or neglected child" is defined in pertinent part as:

A child less than 18 years of age whose parent or guardian, as herein defined, (1) inflicts or allows to be inflicted upon such child physical injury by other than accidental means which causes or creates a substantial risk of ... protracted impairment of physical or emotional health or protracted loss or impairment of the function of any bodily organ; ... (3) commits or allows to be committed an act of sexual abuse against the child; (4) or a child whose physical, mental, or emotional condition has been impaired or is in imminent danger of being impaired as the

result of the failure of his parent or guardian, as herein defined, to exercise a minimum degree of care. . . .

DCF's statutory obligation "[u]pon receipt of any such report" of abuse or neglect is to take immediate action "to insure the safety of the child." *N.J.S.A.* 9:6–8.11. In other words, quickly removing the child from harm's way is a particular focus of the statute. Part and parcel of DCF's charge is to "initiate an investigation within [twenty-four] hours" and report to the child abuse registry within seventy-two hours. *N.J.S.A.* 9:6–8.11. First, DCF conducts an initial investigation to determine if a formal investigation is necessary. The standards for evidence collection are set forth in *N.J.A.C.* 10:129–2.4 to –2.5. At that initial stage there are two possible findings: substantiated or unfounded.

"Substantiated" means a finding when the available information, as evaluated by the child protective investigator, indicates by a preponderance of the evidence that a child is an abused or neglected child as defined in *N.J.A.C.* 10:133–1.3 because the alleged child victim has been harmed or placed at risk of harm by a parent or guardian.

. . . .

"Unfounded" means a finding when:

i. There is not a preponderance of evidence that the alleged child victim was harmed or placed at substantial risk of harm; or

ii. There is not a preponderance of evidence indicating that a parent or guardian and child were involved.

[*N.J.A.C.* 10:129–1.3.]

A formal investigation must be commenced unless the "child protective investigator" makes a finding of "unfounded at the conclusion of the initial investigation." *N.J.A.C.* 10:129–2.8(a).

If the alleged abuse or neglect is committed by a tenured school employee, whether or not in connection with his official duties, that conduct might also cause a school board to commence disciplinary action:

No person shall be dismissed or reduced in compensation, (a) if he is or shall be under tenure of office, position or employment during good behavior and efficiency in the public school system of the state, . . . except for inefficiency, incapacity, unbecoming conduct, or other just cause, and then only after a hearing held pursuant to this subarticle, . . . after a written charge or charges, of the cause or causes of complaint. . . .

[*N.J.S.A.* 18A:6–10. *See also N.J.S.A.* 18A:28–5 (stating that a tenured school employee "shall not be dismissed or reduced in compensation except for inefficiency, incapacity, or conduct unbecoming such a teaching staff member or other just cause").]

Unbecoming conduct involves a different standard than the Title 9 abuse-or-neglect standard and has been defined as conduct "which has a tendency to destroy public respect for [government] employees and confidence in the operation of [public] services." *Karins v. City of Atl. City,* 152 *N.J.* 532, 554, 706 *A.*2d 706 (1998) (citation omitted). Unbecoming conduct may include "any conduct which adversely affects the morale or efficiency of the [department.]" *Ibid.* (citation omitted). The touchstone of the determination lies in the certificate holder's "fitness to discharge the duties and functions of one's office or position." *In re Grossman,* 127 *N.J.Super.* 13, 29, 316 *A.*2d 39 (App.Div.1974).

Title 18A mandates official actions and proceedings that provide employees significantly more rights and protections than do Title 9 initial investigations. A district initiates charges by filing a written statement of evidence under oath. *N.J.S.A.* 18A:6–11; *N.J.A.C.* 6A:3–5.1. A majority of the board must vote within forty-five days on whether there is probable cause to credit the evidence, and if credited, whether such charge is sufficient to warrant dismissal or reduction of salary. *N.J.S.A.* 18A:6–11 to – 13. An employee has fifteen days to submit a written response and if the Commissioner determines the charge is sufficient to warrant dismissal, the case is referred to the OAL within ten days. *N.J.S.A.* 18A:6–16.

Because of the due process concerns that inform tenure proceedings, the urgency that is built into DCF's investigation is absent. That is because the DCF process is focused on the safety of the child, whereas the tenure action concentrates on the conduct of the employee. Indeed, in a tenure case it is the employee's inefficiency, incapacity or misconduct that is at the heart of the action.

## IV.

With that as a backdrop, we turn to the words of the statute. *N.J.S.A.* 18A:6–7a states:

> When a complaint made against a school employee alleging child abuse or neglect is investigated by the Department of Children and Families, the department shall notify the school district and the employee of its findings. Upon receipt of a finding by the department that such a complaint is unfounded, the school district shall remove any references to the complaint and investigation by the department from the employee's personnel records. A complaint made against a school employee that has been classified as unfounded by the department shall not be used against the employee for any purpose relating to employment, including but not limited to, discipline, salary, promotion, transfer, demotion, retention or continuance of employment, termination of employment or any right or privilege relating to employment.

According to Young, the word "complaint" refers to the substance of the accusation itself, which may not be used against an employee in further disciplinary proceedings. The District and the Commissioner counter that "complaint" is a reference to the school official's mandatory report to the DCF, and that that is distinct from the police investigation and the separate compilation of evidence in support of tenure charges, which are "separate causes of action, pursuant to separate legal authority, and effectuated by separate proceedings."

The parties' dueling interpretations regarding whether "complaint" refers to the underlying allegations, as Young asserts, or to the actual complaint made to DCF regarding alleged child abuse and neglect, as the District and the Commissioner claim, fairly demonstrate an ambiguity in the plain language of the statute; indeed, on its face, it can be read either way.

## V.

Thus we turn to the legislative history surrounding the enactment of the statute in 1995. The Senate Education Committee's statement to the proposed legislation said:

> The bill provides that when a complaint made against a school employee alleging child abuse or neglect is investigated by the Division of Youth and Family Services, the division shall notify the school district and the employee of its findings. If the division's finding is that the complaint is unfounded, the school district *must*

> *remove any references to the complaint and the investigation from the employee's*
> *personnel records, and the complaint may not be used against the employee for*
> *any purpose relating to employment.*
>
> [*S. Educ. Comm. Statement to Assemb., No. 510,* 206th Leg. (N.J. 1994) (emphasis
> added).]

Although that sparse history suggests, to some extent, an intent to remove physical references to a DCF complaint from a school employee's file, it does not resolve the ambiguities surrounding the use of the term "complaint."

## VI.

We return then to basic principles of statutory interpretation and, in particular, the great deference we accord to the administrative agencies charged with enforcing particular legislation. *Merin v. Maglaki,* 126 *N.J.* 430, 436–37, 599 *A.*2d 1256 (1992). Indeed the agency's construction is a substantial factor to be considered in divining the meaning to be ascribed to a statute. *Smith v. Dir., Div. of Taxation,* 108 *N.J.* 19, 25–26, 527 *A.*2d 843 (1987); *N.J. Dep't of Envtl. Prot. & Energy v. Gloucester,* 866 *F.Supp.* 826, 832 (D.N.J.1994).

Here, the agency has weighed in on the meaning of *N.J.S.A.* 18A:6–7a and declared that it does not bar subsequent tenure charges where DCF has concluded that an abuse complaint is unfounded. Because the statute is ambiguous as to the issue presented, "the question for the [C]ourt is whether the agency's answer is based on a permissible construction of the statute." *Kasper, supra,* 164 *N.J.* at 581, 754 *A.*2d 525 (citation omitted). Here, the Commissioner found that the

> statute requires that no action be taken against a school employee on the basis of a
> complaint or abuse made to the DCF if that agency determines that the complaint
> is unfounded. It also mandates that in the case of a DCF finding of "unfounded,"
> all reference to the DCF complaint and investigation be removed from the
> employee's file. In the present case, no action was taken against respondent as a
> result of the DCF investigation and apparently no reference to it remains in
> respondent's file. Thus, *N.J.S.A.* 18A:6–7a has been satisfied.

We conclude that that is a permissible construction of the statute and thus concur with the Appellate Division that the Commission-

er properly determined that *N.J.S.A.* 18A:6–7a did not preclude the filing of tenure charges in this matter.

Here, DCF's investigation determined, at least in part, that because C.W. "sustained no injuries" and was not placed "at risk of harm" that Young's behavior did not meet the statutory definition of abuse or neglect. Had nothing further occurred, Young was entitled to have his record scrubbed of any reference to the unfounded accusation and that accusation could not be used against him for any purpose.

However, that did not bar the District, in cooperation with the police, from conducting a full independent investigation that uncovered additional evidence [2] that supported the filing of tenure charges based on conduct unbecoming a teacher. That exercise of the District's supervisory power over a school employee was entirely unremarkable. *See Karins, supra,* 152 *N.J.* at 554, 706 *A.*2d 706; *In re Grossman, supra,* 127 *N.J.Super.* at 29, 316 *A.*2d 39. Indeed, it would be anomalous to hamstring the District solely because of a less than complete investigation by DCF or one whose focus was different from the focus in a tenure case.

Furthermore, an interpretation of a statute should not lead to an absurd result. *Schad, supra,* 160 *N.J.* at 170, 733 *A.*2d 1159. Young's assertion that *N.J.S.A.* 18A:6–7a bars the District from initiating any disciplinary action after DCF issued an investigative determination of "unfounded" would effectively prohibit school districts from disciplining a teacher for unbecoming conduct merely because it did not rise to the level of abuse or neglect under *N.J.S.A.* 9:6–8.21.

For example, DCF might conclude that sexual contact between a student and his former teacher does not constitute abuse or neglect under *N.J.S.A.* 9:6–8.21c because of the age of

---

[2] After DCF determined the allegations were unfounded, the District forwarded the DCF investigator receipts from the motel where the alleged sexual incident occurred, which DCF did not have during its investigation; however, the investigator declined to re-open the investigation of Young.

the student or because the formal student-teacher relationship had passed. That is a far cry from suggesting that it is not conduct unbecoming a school employee. *See, e.g., In re Ivan Piedra,* Agency Dkt. No. 0708-176, *Exam'rs,* (March 31, 2009) (revoking teacher's certificates and finding that "acts of engaging in a sexual relationship with a student, regardless of [the student's] age, are inexcusable"). Yet, Young's interpretation of *N.J.S.A.* 18A:6-7a would bar a school district from investigating such a claim and from disciplining a teacher simply because its report of suspected abuse to DCF was ultimately declared unfounded under the statute DCF is charged with enforcing. We do not consider that interpretation a reasonable one. Indeed it is inconceivable to us that the legislature intended that a school district with overwhelming evidence of sexual wrongdoing on the part of a teacher, developed after its own investigation, would be powerless to act because DCF found no violation of the abuse and neglect statute. Rather, we agree with the Appellate Division's contrary conclusion that the Commissioner's construction of the statute is a permissible one entitled to deference.

## VII.

 We finally consider Young's claim that the decision of the Commissioner was not based on substantial credible evidence in the record.

Generally, an appellate court does not substitute its judgment of the facts for that of an administrative agency. *Clowes v. Terminix Int'l, Inc.,* 109 *N.J.* 575, 587, 538 *A.*2d 794 (1988). In reviewing administrative adjudications, an appellate court must undertake a "careful and principled consideration of the agency record and findings." *Riverside Gen. Hosp. v. N.J. Hosp. Rate Setting Comm'n,* 98 *N.J.* 458, 468, 487 *A.*2d 714 (1985). "If the Appellate Division is satisfied after its review that the evidence and the inferences to be drawn therefrom support the agency head's decision, then it must affirm even if the court feels that it would have reached a different result itself." *Clowes, supra,* 109 *N.J.* at 588, 538 *A.*2d 794.

Stated differently, if the agency's finding " 'is clearly a mistaken one and so plainly unwarranted that the interests of justice demand intervention and correction, then, and only then, [the appellate court] should appraise the record as if it were deciding the matter at inception and make its own findings and conclusions.' " *Ibid.* (quoting *State v. Johnson,* 42 *N.J.* 146, 162, 199 *A.*2d 809 (1964)). In the same vein, the choice of accepting or rejecting testimony from witnesses resides with the

administrative agency, and so long as that choice is reasonably made it is accorded deference on appeal. *Renan Realty Corp. v. State Dep't of Cmty. Affairs, Bureau of Hous. Inspection,* 182 *N.J.Super.* 415, 421, 442 *A.*2d 614 (App.Div.1981).

[*Campbell v. N.J. Racing Comm'n,* 169 *N.J.* 579, 587–88, 781 *A.*2d 1035 (2001).]

Young challenges the agency's credibility assessments and findings, contending it ignored the significance of some facts and gave improper weight to others. For example, Young believes that the evidence supports his credibility and discredits C.W.'s, and that a finding to the contrary was clearly mistaken. Young also contends that the Commissioner improperly shifted the burden of proof to him.

We find those arguments unpersuasive. As the Commissioner declared, and the Appellate Division noted, the ALJ had the "opportunity to observe C.W. and [Young] at the OAL hearing. He was able to make determinations about the viability of each witness's testimony and about both the overall internal consistency of witness testimony, and its consistency with *all* of the evidence presented at the hearing." We are satisfied, as was the Appellate Division, that there was substantial credible evidence in the record as a whole to support the agency's findings and likewise "discern no improper shifting of the burden of proof or other legal error that would justify disturbing the agency's determination."

## VIII.

The judgment of the Appellate Division is affirmed.

Justice RIVERA–SOTO, dissenting.

This case presents a horrifying, revolting factual setting: a teacher—a professional entrusted with the well-being of students- preyed on a student for sexual gratification. Yet, particularly in light of the gruesome nature of these charges, our role as judges demands that it be irrelevant whether it is personally gratifying to sustain Gilbert Young's removal as a teacher, or personally abhorrent to retain him in that position of trust. In this case, the Court's task is to interpret faithfully and with fidelity a statute

duly adopted by the Legislature. If that statute is clearly written, we are obliged to enforce it as written. *State v. Gandhi*, 201 *N.J.* 161, 177, 989 *A.*2d 256 (2010) (" 'If the plain language leads to a clear and unambiguous result, then our interpretive process is over.' " (quoting *Richardson v. Bd. of Trs., Police & Firemen's Ret. Sys.*, 192 *N.J.* 189, 195, 927 *A.*2d 543 (2007) (citation omitted))); *Patel v. NJ Motor Vehicle Comm'n*, 200 *N.J.* 413, 419, 982 *A.*2d 445 (2009) (same); *Klumb v. Bd. of Educ. of Manalapan–Englishtown Reg'l High Sch. Dist., Monmouth County*, 199 *N.J.* 14, 24, 970 *A.*2d 354 (2009) (same).

The statute at issue is clear, unequivocal, and leads to an unambiguous result. It provides, in relevant part, that

> *[a] complaint* [alleging child abuse or neglect] made against a school employee *that has been classified as unfounded* by the [Department of Children and Families] *shall not be used against the employee for any purpose relating to employment*, including but not limited to, *discipline*, salary, promotion, transfer, demotion, retention or continuance of employment, *termination of employment or any right or privilege relating to employment.*
>
> [*N.J.S.A.* 18A:6–7a (emphasis supplied).]

The meaning of that plain language cannot be the subject of dispute: regardless of the wisdom of the legislative choice, the Legislature has made the self-evident judgment that a child abuse or neglect complaint against a school employee classified as "unfounded" cannot—in the statute's mandatory language, *shall not*—be used to discipline a school employee. And, obviously, what the Legislature has decreed cannot be done affirmatively certainly cannot be done indirectly. Yet, that is precisely the result condoned by the majority. By cloaking the disciplinary charges as "conduct unbecoming" when the charges are firmly and exclusively rooted in the original but declared-unfounded child abuse or neglect complaint, the Court has permitted that which the Legislature explicitly forbade, thus rendering that statute utterly superfluous and meaningless.

It is uncontested that a complaint alleging child abuse or neglect was made against Young. It is also uncontested that the Department of Children and Families classified that complaint as "un-

founded." The only question remaining, then, is whether that complaint and/or the facts giving rise to it [1] can be used to support disciplinary action against a teacher or whether, as unequivocally mandated by the Legislature, that complaint "shall not be used against the employee for any purpose relating to employment, including but not limited to, discipline, ... termination of employment, or any right or privilege relating to employment." *N.J.S.A.* 18A:6–7a.

Seeking to avoid the inevitable, the majority struggles mightily to proclaim an ambiguity in the statute. Yet, this statute is plainly written; there is no ambiguity in it. The only obstacle to its enforcement according to its explicit terms is an understandable disquiet in the result mandated by the direct application of this straightforward and unambiguous statute, a disquiet I too share.

That said, it is not this Court's task to decide whether a statute duly adopted by the Legislature is wise. If plainly written, it is this Court's obligation to enforce a statute—any statute—as the Legislature has written it. Regardless of how unpalatable the result, the statute before us is clear, unequivocal and unambigu-

---

[1] Any attempt to differentiate between a complaint and the facts giving rise to a complaint is utter sophistry; a complaint without facts is meaningless. *See, e.g., R.* 4:5–2 (requiring that any "pleading ... shall contain a statement of the facts on which the claim is based"); *see also Spring Motors Distribs., Inc. v. Ford Motor Co.,* 191 *N.J.Super.* 22, 29–30, 465 *A.*2d 530 (App.Div.1983) (holding that, "[t]o be adequate, a [complaint] must contain a statement of facts on which a claim is based, showing that the pleader is entitled to relief"), *aff'd in part and rev'd in part on other grounds,* 98 *N.J.* 555, 489 *A.*2d 660 (1985). That, however, should not end the inquiry.

Due respect for the statute's plain language does not leave the school district powerless. If the allegations of the unfounded complaint nevertheless were sufficient to sustain Young's prosecution, the proper course was simple: a referral should have been made to the local investigative and prosecution authorities, and an ensuing independently secured conviction—an event entirely independent of the earlier unfounded abuse and neglect complaint—more than sufficiently supports tenure charges. *See N.J.S.A.* 18A:6–10 (authorizing discipline of tenured teacher for "just cause"). That is the proper remedy here, one that avoids neutering the clear provisions of this statute by relegating it to the immaterial status of a record-purging device.

ous. Therefore, in the circumstances presented in this case, our obligation is and remains clear: the statute should be enforced as written, and its correction should be left to the Legislature, the body that created it. Said again: if the plain words of a statute fail to achieve the Legislature's goals, it is for that branch of government to fix its own mistakes.

Accordingly, I respectfully dissent.[2]

*For affirmance*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE and HOENS—6.

*For reversal*—RIVERA-SOTO—1.

---

[2] The tenure charges against Young should have been foreclosed by the application of *N.J.S.A.* 18A:6-7a. For that reason, there is no need to address Young's separate—and, on this record, entirely without merit—assertion that the evidence presented was insufficient to sustain the disciplinary charges.