**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3086-19

JOEL DAWKINS,

     Petitioner-Appellant,

v.

BOARD OF TRUSTEES,
TEACHERS' PENSION
AND ANNUITY FUND,

     Respondent-Respondent.

_____

Argued June 22, 2021 – Decided July 12, 2021

Before Judges Yannotti and Haas.

On appeal from the Board of Trustees of the Teachers' Pension and Annuity Fund, Department of the Treasury.

Stuart Ball argued the cause for appellant.

Matthew Melton, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Matthew Melton, on the brief).

PER CURIAM

Joel Dawkins appeals from a final determination of the Board of Trustees (Board), Teachers' Pension and Annuity Fund (TPAF), which denied his application for accidental disability retirement benefits pursuant to N.J.S.A. 18A:66-39(c). We affirm.

I.

Dawkins has been employed as a teacher in the Newark public school system since 1983. In 2013, he was transferred to the Sussex Avenue Elementary School. On January 7, 2014, Dawkins injured his back and left knee while attempting to break up a fight between students. He returned to work in late February 2014, but he said his injuries worsened over the spring and summer, and he was unable to return to teaching in the fall of 2014. He applied for medical leave and remained out of work on leave until the 2015 spring semester, when he returned to work full duty with certain accommodations for bending and lifting.

In December 2016, Dawkins filed an application for accidental disability retirement benefits. He claimed that in the January 7, 2014 incident, he sustained physical and psychological injuries that rendered him totally and permanently disabled from the performance of his usual duties.

A-3086-19

In January 2017, the Board denied the application. Dawkins filed an administrative appeal, and the Board referred the matter to the Office of Administrative Law for a hearing before an Administrative Law Judge (ALJ).

At the hearing, evidence was presented indicating that on the day of the January 7, 2014 incident, Dawkins underwent a nerve conduction velocity (NCV) study and an electromyography (EMG). These tests showed chronic radiculopathy at the L5 level of the spine.

On January 29, 2014, an MRI was performed of Dawkins' left knee, which indicated that he had a bone contusion in the tibia, with patellar subluxation, localized chondromalacia of the patella, and medial compartment osteoarthritis. In addition, an MRI of the lumbar spine was performed on July 14, 2016. This MRI revealed disc bulging at the L4-L5 level of the spine and multi-level disc herniations with nerve root involvement.

Dawkins testified that before the January 7, 2014 incident, he did not have any problems with his lower back or knee while teaching. However, in February 2013, he had presented to Holy Name Medical Center with a complaint of knee pain. According to the hospital's chart, Dawkins reported he had knee pain since he was young.

3

Dawkins testified that despite these complaints, he never felt the need to see a doctor after his February 2013 visit to the hospital. He also testified that he never experienced any mental health issues before the January 7, 2014 incident.

When Dawkins returned to work after the incident, he was given an assignment at Weequahic High School, where he finished the spring 2014 semester. He said that there were times when he was unable to work because of his injuries. He also stated that in the spring and summer of 2014, his injuries worsened and he was unable to return to teaching in the fall of 2014. He remained out of work on medical leave until the spring of 2015.

It appears that in September 2015, Dawkins was suspended from the Newark school system due to certain tenure charges. The matter was resolved in October 2016, and he was ordered to return to work. He again requested medical leave.

Dawkins treated with his primary care physicians, Dr. Champak K. Gandhi and Dr. Angel De La Cruz. He also treated with Dr. Jonathan M. Archer, an orthopedist; Dr. Gautam Sehgal, a neurologist; and psychologists Dr. Jeffrey Spector and Dr. John Rotondi. They all completed pension and medical benefits forms, which stated that Dawkins was permanently and totally disabled as a

4

direct result of an accident that occurred during the performance of his regular or assigned duties.

Dr. Archer cited Dawkins' chronic lower back pain, sciatica, numbness in the lower extremities, and instability. Dr. Gandhi based his opinion on his observations of the range of motion in Dawkins' back and left knee. Dr. Spector noted that Dawkins had poor concentration caused by depression and anxiety, and Dr. Rotondi indicated that Dawkins was suffering from major depression and post-traumatic stress disorder.

At the hearing, Dawkins presented testimony from Dr. David Weiss, who was qualified as an expert in orthopedics and in impairment and disability. Dr. Weiss testified that he reviewed the MRI films of Dawkins' left knee and lumbar spine from 2014; the EMG and NCV studies of the lower extremities; MRI films of the lumbar spine from 2016; the X-rays of the left knee from 2017, and other medical records and reports. He also performed a physical examination of Dawkins.

Dr. Weiss stated that due to the impairments to Dawkins' lower back and left knee, he would not be able to perform the job-related functions of a teacher. He said the medical records did not indicate that Dawkins had any significant back or knee problems before the January 2014 incident. Dr. Weiss opined that

5

Dawkins' disc herniations, lumbar radiculopathy, internal derangement of the left knee, and patellar femoral pain were direct, traumatic injuries sustained in the January 7, 2014 incident.

Dr. Weiss further testified that during his physical exam, Dawkins exhibited abnormal gait and ambulation; restricted range of motion; pain, muscle spasm and tenderness in the lumbar spine; sensory deficit in the left, lower extremity; and restricted range of motion and tenderness in the left knee. Dr. Weiss said Dawkins had sustained significant musculoskeletal trauma to the lumbar spine and left knee, secondary to a traumatic, work-related injury sustained during the January 7, 2014 incident. He stated that due to the nature of the injuries to the lumbar spine and left knee, Dawkins would not be able to perform the duties of a teacher.

Dawkins also presented testimony from Dr. Martin A. Silverman, who was qualified as an expert in the field of psychiatry. Dr. Silverman conducted a psychological examination of Dawkins in April 2018. He stated that Dawkins had experienced pain and emotional distress due to the January 7, 2014 incident.

He said Dawkins had become more depressed because he was no longer able to teach. He noted that Dawkins had reported he also had been distressed by his father's illness and his death in 2016.

A-3086-19

Dr. Silverman testified that during his examination, he had difficulty keeping Dawkins focused, and noted that Dawkins had to "think hard" during cognitive testing. He described Dawkins as "down, dark, somber, and discouraged." He said Dawkins told him he was no longer the "extraverted, outgoing, active person" that he used to be.

Dr. Silverman stated that in formulating his opinions, he had relied upon Dr. Spector's and Dr. Harold Goldstein's reports. He opined that Dawkins was suffering from severe major depressive disorder, with anxiety and distress. He said this was a serious and permanent condition, which rendered Dawkins totally disabled. He noted that Dawkins was "very depressed."

Dr. Silverman was asked about other factors that could have affected Dawkins' mental health, including his father's illness and death and his suspension from his position on the tenure charges. He responded that he would still find that Dawkins was suffering from depression based solely on the January 7, 2014 incident.

Dr. Silverman stated that Dawkins was not able to return to work due to severe pain and depression. He said the January 7, 2014 incident made Dawkins vulnerable to the impact of later experiences that affected him adversely. He opined that Dawkins' symptoms stemmed directly from the January 7, 2014

7

incident. According to Dr. Silverman, Dawkins was totally and permanently disabled and totally unable to perform the duties of a teacher.

Dr. Andrew Hutter testified on behalf of the Board as an expert in the field of orthopedics. Dr. Hutter reviewed the MRI of Dawkins' lumbar spine and the EMG report. He opined that any injury from an incident like the January 7, 2014 school incident should improve and not result in a "global loss of function."

Dr. Hutter also conducted a physical examination of Dawkins. He testified that Dawkins' left knee showed generalized tenderness and limited range of motion. He explained that the MRI of the left knee from January 2014 showed a stable knee with an intact meniscus and mild osteoarthritic changes, which were caused by wear and tear over a long period of time. He explained that the bone contusion seen on the MRI was a bruise or temporary injury.

Dr. Hutter opined that Dawkins was not totally and permanently disabled as a direct result of the January 2014 incident. He found Dawkins' subjective complaints were out of proportion to and not corroborated by the diagnostic studies or the objective findings from the physical examination.

The ALJ issued an initial decision dated February 3, 2020. The ALJ found Dawkins had not been forthright in his testimony and his testimony was self-serving. The ALJ questioned the honesty of Dawkins' assertion that he did not

A-3086-19

need treatment after his hospital visit in February 2013, and his claim that his knee problems were asymptomatic before the January 2014 incident.

The ALJ found that Dawkins' left knee injury was pre-existing and symptomatic before the January 2014 incident. The ALJ noted that Dawkins had not testified regarding the stress of caring for his ill father and his father's death in 2016, and whether this was a contributing factor of his depression. Dawkins also had not addressed the stress he felt from the tenure charges that the school district filed against him.

The ALJ further found that Dr. Silverman had not presented credible testimony regarding his alleged psychological conditions. The ALJ stated that:

> [Dr.] Silverman diagnosed Dawkins with a total and permanent severe major depressive disorder and opined that the depression was causally connected to the 2014 incident. However, [Dr.] Silverman could not state whether Dawkins['] depression alone prevented him from returning to work. Nor could he rule out that Dawkins could have been able to return to work absent other circumstances, such as the 2016 death of his father and the lack of support from the school district [and the] resulting tenure charges and suspensions. Further, [Dr.] Silverman was unable to decipher what, if any, treatment plan Dawkins was implementing or medications Dawkins received and might be taking or had taken in the past for his psychological conditions.

In addition, the ALJ found that while both Dr. Weiss and Dr. Hutter had presented credible testimony, "the scales [tipped] in favor of [Dr.] Hutter, as

9

they pertain to Dawkins['] orthopedic injuries." The ALJ found that Dr. Weiss' opinion was mostly predicated on subjective, rather than objective findings. The ALJ therefore gave greater weight to Dr. Hutter's opinion. The ALJ concluded that Dawkins' injuries, both orthopedic and psychological, were not totally and permanently disabling and were not caused by the January 7, 2014 incident.

At its meeting on March 5, 2020, the Board voted to accept the ALJ's initial decision, with modification. The Board found that Dawkins was not totally and permanently disabled on an orthopedic basis and any physical injury that he sustained in the January 7, 2014 incident was temporary.

The Board noted that Dawkins also was seeking accidental disability retirement based on a mental disability, without a permanent physical injury, and he was required to satisfy the criteria established in Patterson v. Board of Trustees, State Police Retirement System, 194 N.J. 29, 48 (2008), applied. The Board found that Dawkins had not carried his burden under Patterson because the January 2014 incident "did not involve actual or threatened death or serious injury." This appeal followed.

II.

On appeal, Dawkins argues that the Board erred by denying his application for accidental disability retirement benefits. He contends the

10

evidence clearly established the causal relationship between the January 7, 2014 incident and his disability. We do not agree.

"Our review of administrative agency action is limited." Russo v. Bd. of Trs., Police & Firemen's Ret. Sys., 206 N.J. 14, 27 (2011) (citing In re Herrmann, 192 N.J. 19, 27 (2007)). "An administrative agency's final quasi-judicial decision will be sustained unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record." Ibid. (quoting Herrmann, 192 N.J. at 27-28). Our review of an agency's decision is limited to considering:

> (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
>
> [In re Proposed Quest Acad. Charter Sch. of Montclair Founders Grp., 216 N.J. 370, 385-86 (2013) (quoting Mazza v. Bd. of Trs., 143 N.J. 22, 25 (1995)).]

We are required to affirm an agency's findings of fact if "supported by adequate, substantial and credible evidence." In re Taylor, 158 N.J. 644, 656-57 (1999) (quoting Rova Farms Resort, Inc. v. Inv'rs. Ins. Co. of Am., 65 N.J. 474, 484 (1974)). Moreover, "[i]f [we are] satisfied after [our] review that the

11

evidence and the inferences to be drawn therefrom support the agency head's decision, then [we] must affirm even if [we] feel[] that [we] would have reached a different result . . . ." Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 588 (1988).

"[A]n accidental disability retirement entitles a member to receive a higher level of benefits than those provided under an ordinary disability retirement." Patterson, 194 N.J. at 43. A member of the TPAF is eligible to be retired "on an accidental disability allowance" if the "member is permanently and totally disabled as a direct result of a traumatic event occurring during and as a result of the performance of his regular or assigned duties . . . ." N.J.S.A. 18A:66-39(c).

In Richardson v. Board of Trustees, Police & Firemen's Retirement System, 192 N.J. 189, 212-13 (2007), the Court held that to obtain accidental disability benefits, the member of the pension systems must show:

> 1. that he [or she] is permanently and totally disabled;
>
> 2. as a direct result of a traumatic event that is
>
>   a. identifiable as to time and place,
>
>   b. undesigned and unexpected, and
>
>   c. caused by a circumstance external to the member (not the result of pre-existing

disease that is aggravated or accelerated by the work);

    3.    that the traumatic event occurred during and as a result of the member's regular or assigned duties;

    4.    that the disability was not the result of the member's willful negligence; an[d]

    5.    that the member is mentally or physically incapacitated from performing his [or her] usual or any other duty.

[Ibid.]

Where, however, the member seeks accidental disability retirement based on a permanent mental injury caused by a mental stressor without any physical impact, the claimant also must meet the standard established in Patterson. 194 N.J. at 48. The member must show that the permanent disabling mental injury

is the direct result of a mental stressor that is identifiable as to time and place, undesigned and unexpected, external to the member (not the result of pre-existing disease that is aggravated or accelerated by the work), that occurred during and as a result of the member's duties, and was not the result of the member's willful negligence, . . .

[Ibid.]

Under Patterson, the disability must be the result of a "direct personal experience of a terrifying or horror-inducing event that involves actual or threatened death or serious injury, or a similarly serious threat to the physical

13

A-3086-19

integrity of the member or another person." Id. at 50. Events that would meet this standard include a policeman who sees his or her partner shot; a teacher who is held hostage by a student; and a government lawyer who is used as a shield by a criminal defendant. Ibid.

Here, the ALJ and the Board found that Dawkins had not shown he was suffering from a permanent disabling orthopedic injury as a result of the January 7, 2014 incident. The ALJ and the Board noted that any physical injury Dawkins suffered in that incident was temporary. The ALJ and the Board found that Dr. Hutter's testimony was more persuasive and entitled to greater weight than the testimony of Dawkins' orthopedic expert, Dr. Weiss.

Dr. Hutter testified that based on his review of the MRI of Dawkins' lumbar spine and the EMG studies, any injury Dawkins sustained from the January 7, 2014 incident should improve and not result in a "global loss of function." Dr. Hutter noted the MRI showed that Dawkins had a stable left knee, with an intact meniscus and mild osteoarthritic changes caused by wear and tear over a long period.

Dr. Hutter further testified that the bone contusion shown on the MRI of the knee was a temporary, rather than permanent, injury. In addition, Dr. Hutter opined that Dawkins' subjective complaints were out of proportion to and not

14

corroborated by the objective findings of his physical exam or the diagnostic studies. Thus, there is sufficient credible evidence in the record to support the ALJ's and the Board's finding that Dawkins did not suffer a permanent disabling injury to his back or knee in the January 2014 incident.

The record also supports the Board's finding that Dawkins had not satisfied the criteria under Patterson for an accidental disability retirement based on a mental injury without a permanent disabling physical injury. The record shows that the January 7, 2014 incident was not a "terrifying or horror-inducing event that involves actual or threatened death or serious injury, or a similarly serious threat to the physical integrity of" Dawkins or another person. Patterson, 194 N.J. at 50.

III.

Dawkins argues, however, that the medical evidence presented at the hearing conclusively established that he is totally and permanently disabled. He contends the ALJ and the Board erred by failing to accept the testimony and opinions of his treating physicians. He asserts Dr. Weiss's and Dr. Silverman's testimony was determinative, and that Dr. Hutter's testimony supports, rather than negates, his claim that he sustained a permanent disabling injury in the January 7, 2014 incident.

A-3086-19

We are convinced, however, that the ALJ and the Board had the discretion to weigh the differing opinions of the experts and reasonably found Dr. Hutter's testimony and opinions were more persuasive than those of Dr. Weiss. "[T]he choice of accepting or rejecting testimony from witnesses resides with the administrative agency, and so long as that choice is reasonably made it is accorded deference on appeal." In re Young, 202 N.J. 50, 70-71 (2010) (quoting Campbell v. N.J. Racing Comm'n, 169 N.J. 579, 587-88 (2001)).

Dawkins further argues that the ALJ and the Board erred by refusing to accept Dr. Silverman's testimony regarding his psychological injuries. In her initial decision, the ALJ explained that Dr. Silverman had relied upon two reports in reaching his opinion. Those reports had been prepared three years after the 2014 incident and were based on Dawkins' condition at that time. The ALJ stated:

> Neither Dawkins nor [Dr.] Silverman were able to testify that based solely on Dawkins['] depression[,] he was unable to return to work. Nor was it clear from the evidence presented at [the] hearing[] whether or not Dawkins had a treatment plan or was taking medication post the January 7, 2014 incident in order to stabilize his symptoms so he would be able to return to work. Many people who are properly treated and take medication are capable of working at their jobs, especially those who are provided with accommodations, as Dawkins was. In addition, [Dr.] Silverman and Dawkins were unable to connect

16

Dawkins['] psychological condition to the January 7, 2014 incident. [Dr.] Silverman and Dawkins were both unable to state with certainty that Dawkins['] psychological condition actually began after the incident and was not triggered by the stress of caring for his ailing father who passed away in 2016 and the stress brought on by the district pertaining to tenure charges.

Thus, the record supports the ALJ's and the Board's finding that Dawkins did not establish that he is totally and permanently disabled as a result of a psychological condition. Dawkins also failed to establish that his alleged psychological injuries were the direct result of the January 7, 2014 incident.

Dawkins also contends the ALJ and the Board did not give sufficient weight to the disability determination of the federal Social Security Administration (SSA), which found that Dawkins had become disabled on August 20, 2015. Dawkins contends the SSA's decision was evidence showing he was totally and permanently disabled. However, a disability determination by the SSA is based on a different standard under a different program than an accidental disability retirement. See Villanueva v. Zimmer, 431 N.J. Super. 301, 318-19 (App. Div. 2013) (noting that the lack of a meaningful adversarial process makes the SSA's disability determinations "unreliable").

Furthermore, Dawkins acknowledged the SSA's decision had been based in part on occurrences that were not related to the January 7, 2014 incident,

including an injury he sustained at Thanksgiving in 2016, which apparently caused neck and facial paralysis. The ALJ and the Board reasonably refused to consider the SSA's disability determination in determining whether Dawkins was entitled to accidental disability retirement benefits under N.J.S.A. 18A:66-39(c).

In addition, Dawkins contends: (1) the Board erred by applying the Patterson standard to him because he allegedly sustained serious physical injuries in the January 7, 2014 incident; (2) there were no external circumstances that broke the causal link between the January 7, 2014 incident and his disabling injuries; (3) the ALJ and the Board improperly discounted the evidence of his psychiatric injuries; and (4) the ALJ and the Board placed undue significance on the worsening of his back injuries.

These arguments lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3086-19